Matthew A. CATTARO, Plaintiff,

v.

NORTHWEST AIRLINES, INC., and
United States of America,
Defendants.

Civ. A. No. 2884.

United States District Court
E. D. Virginia,
at Alexandria.

Dec. 23, 1964.

John W. Jackson, Arlington, Va., John Hamilton, Washington, D. C., for plaintiff.

E. Waller Dudley, of Boothe, Dudley, Koontz & Blankingship, Alexandria, Va., for defendant Northwest Airlines.

C. Vernon Spratley, U. S. Atty., and Plato C. Cacheris, First Asst. U. S. Atty., Martin S. Wagner and Thomas L. Young, U. S. Dept. of Justice, Washington, D. C., for defendant United States.

LEWIS, District Judge.

The plaintiff brought suit in the United States District Court for the District of Columbia against the United States of America and Northwest Airlines, Inc., seeking damages for injuries resulting from the near miss of a B–47 jet bomber and a Northwest commercial airliner. Northwest Airlines, Inc. answered the complaint and cross-claimed against the Government. Following transfer to this Court the Government answered and filed a cross-claim against Northwest Airlines.

Jurisdiction was predicated on the Federal Tort Claims Act, 28 U.S.C. § 1346(b).

The plaintiff was a fare-paying passenger on Northwest Airlines Flight No. 70 departing from Minneapolis, Minnesota, at 5:14 p. m., Central Standard Time, November 3, 1960, bound for Washington, D. C. In the cockpit of NW 70 were the pilot Gordon H. Lindstam, the first officer Claire A. Davis, and the flight officer John I. Snede. The aircraft was a Lockheed Electra L–188 driven by four engines. The first officer was handling radio communications but all three crew members could hear the conversation between the first officer and the ground air traffic controller.

The flight plan for NW 70, duly filed by Captain Lindstam with the Minneapolis Control Center prior to departure, called for an instrument flight rules (hereinafter referred to as IFR) flight, at an altitude of 25,000 feet, the first segment of which was from Minneapolis east to Eau Claire Omni and then farther east to the Green Bay Omni. These Omnis were high frequency radio navigational stations located in the vicinity of Eau Claire and Green Bay, Wisconsin, respectively, and were used by pilots to fly from point to point.

After take-off NW 70 proceeded on its assigned easterly heading of 80° toward Eau Claire. When several minutes west of Eau Claire, flying at an altitude of approximately 20,000 feet and climbing to an altitude of 25,000 feet, NW First Officer Davis observed a fast moving light which he assumed to be another aircraft proceeding northbound. Captain Lindstam and the flight engineer noted this lighted object at about the same time.

Shortly thereafter NW 70 was advised by Controller Loibl of the Minneapolis Control Center " * * * have traffic eleven o'clock range now six miles proceeding northbound high speed target." First Officer Davis acknowledged this communication, replying "We got him." Davis then radioed the Control Center "Looks like he might be about twenty-three or twenty-four thousand," this being the Northwest crew's estimate of the altitude of the observed target. Loibl replied "Ah—roger—and seventy, I believe it is a B–47 aircraft operating VFR conditions on top vicinity of Eau Claire. No reported altitude."

The Northwest crew continued watching this other aircraft while continuing on its heading of 80°, and passed over Eau Claire at 5:31, Central Standard Time. Weather, VFR. Shortly thereafter Minneapolis radioed "Northwest, seventy, the traffic turned right, he's now—looks like ten o'clock, your position, range five miles proceeding eastbound." Northwest replied "Seventy—we got him." This indicated that the other aircraft was no longer proceeding north and away from NW 70 but was paralleling its course at a distance of five miles. Northwest continued on its eastbound course at a speed of approximately two hundred twenty knots heading for Green Bay. The crew continued to watch the other aircraft.

Flight Engineer Snede observed the other aircraft turning southward. A few seconds later an advisory from the Minneapolis Center confirmed Engineer Snede's observation " * * * your traffic is now turning southbound again."

NW 70 replied "Ah—seventy, we got him." Approximately thirty seconds later NW radioed Minneapolis "That traffic was at twenty-three thousand and he came very, very close out here—pretty rough time getting out of his way."

Captain Lindstam watched the other aircraft as it closed in on him quite rapidly. He turned on additional lights—wing and taxi lights—when he saw the other aircraft turn south and head in his direction.

The B–47 bomber had turned south about forty or forty-five seconds prior to the time Captain Lindstam put the Northwest airliner into a steep dive in order to avoid the impending mid-air collision. He went under the B–47, quite close. The captain did not advise his passengers of the impending difficulties or flash on the fasten-seat-belt light before taking his evasive action.

After the near miss the recorded conversation between the Northwest airliner and the Minneapolis Control Center reads as follows:

"Center: * * * he's still proceeding southbound, he's about five o'clock your position now range seven miles. * * * Your traffic is still five o'clock now fifteen miles still southbound.

"NW 70: * * * we really nearly got it that time, that guy sashaying around up here, and boy, I just don't want to be up here if he's going to keep doing that kind of stuff.

"Center: Roger, seventy, stand by one.

"NW 70: Ah—it was really close—there's no kidding about it and we don't know which way he's going, his altitude or anything else, it's ridiculous.

"Center: Roger, Northwest seventy, would you care to file a near miss report?

"NW 70: Yes, I would, and we had to make such a violent maneuver to get out of his way I think we are going to have to return to Minneapolis with some people that are pretty well shook up in the back end.

"Center: Roger, Northwest seventy, do you desire to return to Minneapolis now?"

The flight engineer shortly after the near miss went to the rear of the plane and observed considerable turmoil, with most of the passengers being considerably shaken up and some of them probably seriously injured.

The Northwest airliner then returned to the Minneapolis airport to have the aircraft checked and to have the injured passengers treated. During the return trip to Minneapolis further recorded communication between NW 70 and Center reads:

"NW 70: * * * on that traffic out there, which way did he head after he turned, he started southbound and then he turned right at the—there for awhile, do you know what the heading he was heading?

"Center: Roger, seventy, when we first noticed him he was about if I recall eleven o'clock your position five or six miles headed north, then he turned eastbound and he paralleled your course for approximately ten miles, then he turned south and was proceeding due south I believe when he was traffic dead ahead of you.

* * * * * *

"NW 70: Seventy, go ahead.

"Center: Roger, Northwest seventy, can you give us the weather conditions in the Eau Claire area at the time of the incident?

"NW 70: CAVU.

* * * * * *

"Center: Roger, could you advise of your horizontal and vertical separation at the time that you had to take evasive action—or at the closest point between the two aircraft.

"NW 70: That would be pretty hard to say, it looks like he was coming right at us and we finally pulled up over him and he went under us, so we got quite a shock from the—either the pull-up or the wash from the jet.

"Center: Roger, could you give us even an approximate idea of how close you came at the closest point?

"NW 70: I think he went pretty close—right under us—would be my estimate.

"Center: Seventy, roger.

"NW 70: Could you see anything on the screen there—how it looked?

"Center: Roger, he looked as though you would have crossed directly over or under the aircraft.

"NW 70: That's what I thought.

"Center: Roger.

"NW 70: We had him in the window here for quite awhile and we just couldn't—I mean a few, five seconds or so, and we just couldn't seem like to get away from him.

"Center: Roger."

The other airplane involved in the near miss incident was a B-47 jet bomber (Della 68) then manned by Captain Jack Hamilton, pilot, and Captain Donald R. Becker, copilot. The bomber was then flying IFR/VFR on top at 30,000 feet in the vicinity of Eau Claire waiting for penetration time (5:43 p. m., Central Standard Time) for a low level bombing run. Upon arrival at Eau Claire Captain Hamilton contacted both the Minneapolis and Eau Claire radios and received permission to descend VFR to flight level 23,000 feet and enter a right-hand holding pattern on the 202° radial of the Eau Claire Omni. Eau Claire was notified when Della 68 was at level 23,000 feet. Shortly thereafter Captain Hamilton was advised by the Minneapolis Center [1] via the Eau Claire Center that a Northwest Lockheed Electra was proceeding from Minneapolis to Green Bay, Wisconsin, via Eau Claire, at 25,000 feet altitude. The captain notified Eau Claire that he had adequate separation as he was flying at 23,000 feet. Immediately thereafter the Northwest aircraft passed under the bomber as it was making a right-hand turn inbound at 202° radial. Neither Captain Hamilton nor Copilot Becker saw the Northwest airliner prior to the time of the near miss. The pilot says his vision was obscured by the ground lights from Minneapolis and the sunset haze. Sky conditions were clear— no clouds, good visibility all round.

David Loibl, an employee of the Federal Aviation Agency, was the radar traffic controller on the departing sector of the Minneapolis Control Center monitoring NW Flight No. 70 from Minneapolis to Eau Claire on the day in question. One of his duties was to provide the separation for departing aircraft then leaving Minneapolis. Mr. Loibl was standing within six or seven feet of three other air traffic controllers then monitoring other sectors of the Minneapolis Air Control Center. He was acquainted with the flight plan of NW 70 and was monitoring this flight on his radar screen as it approached Eau Claire when he noticed another target on his radar screen proceeding northbound farther to the east, closer towards Eau Claire than the NW 70 flight. This target was on his radar screen for some five or six minutes. He did not know its altitude. He saw it turn to an easterly holding for approximately five miles and then noted a right turn heading south.

Controller Loibl was in constant radio communication with the first officer on NW 70. They discussed this target on four or five occasions, the last conversation being when the target turned south. Thereafter Controller Loibl observed this target as being on a collision course with NW 70 for approximately fifty or sixty seconds. He saw the targets merge on his radar during this period. He did not

---

1. The bomber was having some difficulty in maintaining contact with Minneapolis on several suggested frequencies.

further communicate with NW 70 until after the near miss.

Controller Loibl learned from conversations with fellow Air Traffic Controller Wells during the time that he had the target under observation on his radarscope that the target was a B-47 bomber flying VFR on top 30,000 feet near Eau Claire and that the bomber would have to come down to 23,000 feet before commencing its oil burner mission. He was never advised that one of his fellow air traffic controllers in the Minneapolis Center had given the bomber clearance to descend to 23,000 feet and enter a holding pattern in the vicinity of the Eau Claire Omni. He did not know that the bomber had filed its flight plan with the Minneapolis Ground Center or that the Center was in radio contact with the B-47.

Air Traffic Controller Gould was the backup radio controller in charge of air traffic at or about 24,000 feet. He had the flight strip telling about the flight plan of NW 70 and the flight plan of the B-47 bomber. He could talk to Controller Loibl and also see his radarscope from his position in the Minneapolis Control Center. Controller Gould cleared the bomber to descend to 23,000 feet after receiving a nod from Controller Christian.

The air traffic controllers in the Minneapolis Control Center were assigned to specific sectors—some monitoring departing airplanes—others incoming airplanes—others in charge of air traffic at or above certain altitudes. There was no coordinator assigned to coordinate the monitoring of the two sectors involved in this near miss on the day in question.

The plaintiff, Matthew A. Cattaro, was injured by being thrown from his seat when the pilot of the Northwest airliner made his evasive dive in order to avoid the oncoming jet bomber. His head hit the ceiling of the airplane. It hurt continuously for some time thereafter and felt numb on the right side, mostly toward the back.

Mr. Cattaro returned to Washington by train. He returned to work the following Monday morning. He saw a doctor a day or so later. He was X-rayed at the Olney Hospital for possible concussion. His headaches and numbness continued. He became nauseated and dizzy during the summer of 1961. His condition continued to deteriorate and he was operated on June 15, 1962. The operation disclosed an arachnoidal cyst reaching from the middle side of the posterior fossa to the second vertebra downward—$C_1$-$C_2$—and the rear of the cyst was removed. The attending physicians were of the opinion the cyst was of traumatic origin—if congenital, the blow on the head aggravated the pre-existing condition, causing the injury complained of.

Residuals, in addition to the loss of $C_1$-$C_2$ (vertebrae), include a slow-down in the plaintiff's overall activities together with psychological after-effects resulting from the cranial operation, loss of time from work (approximately six months), plus shortened work days due to fatigue. Hospital and doctor bills totaled a little over $5,000.00.

■ Upon this evidence the Court concludes both defendants were guilty of negligence contributing to cause, or concurring in causing, the plaintiff's injuries.

■ The primary duty and responsibility of keeping aircraft from creating a collision hazard to one another rest with those who are in command of the aircraft. CAR 60.2. It amounts to reckless operation when a pilot lacks vigilance in observing other air traffic or in passing too closely. CAR 60.12(c) (d). See also CAR 60.14. No person shall operate an aircraft in such proximity with other aircraft as to create a collision hazard. CAR 60.15. The one on the left converging at approximately the same altitude, absent visibility restrictions, shall give way to the one on the right (see CAR 60.14(b)), and shall avoid passing over or under the other or crossing ahead of it unless passing well clear. CAR 60.14. These duties imposed by the Civil Air Regulations have the force and effect of law. Federal Crop Insurance

Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10.

Northwest was flying IFR[2] at the time of the near miss. The Government bomber was flying VFR.[3] Both were in a controlled air space.[4] Visibility was unlimited. Neither the pilot nor the co-pilot of the B–47 bomber saw the Northwest airliner until they were flying over it. They were charged with the duty of looking and seeing what a reasonably prudent pilot would have seen under the same circumstances. The bomber pilot was clearly guilty of negligence contributing to the near miss. He was told a commercial airliner was near Eau Claire. It was well lighted and directly in front of him for a minute or so after he turned south yet he did not see it. His claim of Minneapolis ground-light interference was unsupported by other evidence. To the contrary, the Government's expert witness in this field refuted it.

■ In addition to complying with all of the rules imposed by CAR for the regulation of air traffic in controlled areas, the Northwest crew was required to exercise the highest degree of care for the safety of its passengers reasonably to be expected from human vigilance and foresight. United States Fidelity & Guaranty v. Milwaukee & Suburban Transport Corp., 18 Wis.2d 1, 117 N.W. 2d 708. They first saw the B–47 bomber six or seven miles on their right. They saw it proceed north and then turn south. They received several traffic advisories re this airplane from the Minneapolis Control Center. The captain observed this airplane coming towards him for approximately forty-five seconds after he had turned on his warning lights before taking his evasive action (steep dive).

■ Waiting until the last second before attempting to get out of the way of an oncoming airplane is not such care, albeit he had the right of way.

"No person shall operate an aircraft. [or permit it to remain] in such proximity to other [known] aircraft as to create a collision hazard." CAR 60.15.

The negligence of the Northwest pilot contributed to the near miss.

■ The failure of the Northwest pilot to light the fasten-seat-belt sign in the airliner as soon as he sensed, or should have sensed, the probability of necessary disruptive (to the passengers) evasive action contributed to the injuries sustained by the plaintiff. Probable danger justifying the pilot in turning on his outside lights was such as to warrant the turning on of the fasten-seat-belt sign, especially so as here where the pilot had at least a forty-five-second warning that sudden evasive action might become necessary.

The Minneapolis and Eau Claire Control Centers were facilities of the Federal Aviation Agency, a part of the United States Government. One of the functions of these control centers is to provide for the safe, orderly and expeditious movement of air traffic. The Northwest flight was being monitored by Controller Loibl from Minneapolis. Its flight plan had been filed with the Center. The B–47 flight plan was likewise filed with the Minneapolis Control Center. The B–47 pilot requested and received permission from the Minneapolis Center via Eau Claire to drop down to a 23,000-foot altitude and enter a holding pattern in an area the Control Center knew, or should have known, the Northwest flight was about to enter. The bomber pilot was erroneously told the Northwest flight was then at 25,000 feet. The Northwest pilot was never told that the B–47 was cleared for 23,000 feet and would cross his path near Eau Claire.

The Government takes the position its air traffic controllers had no duty or obligation to keep the B–47 bomber and

2. Instrument Flight Rules.

3. Visual Flight Rules.

4. Controlled air space is that air space designated by the Administrator as a con-trol zone, control area or continental control area within which aircraft control is exercised.

the Northwest airliner apart, that being the responsibility of the respective pilots, and especially so since the B-47 was then flying VFR.

 The Government undertook such duty whether it had it or not and in so doing became chargeable with the negligence of its employees in the premises. Here, instead of separating the flights, Controller Gould put the bomber on a collision course with the airliner then being monitored by radio and radarscope by Controller Loibl. Mr. Loibl observed the two converging targets merge on his radarscope for a period of at least forty-five seconds without advising either pilot of the impending danger. Had the controllers conferred with each other (they were working within six feet of each other) or familiarized themselves with the recorded flight plans of the two aircraft in question the collision hazard thus created would have been avoided. A Government air traffic controller cannot authorize an airplane to fly a collision course with another airplane then being monitored by another Government controller and escape liability by claiming neither controller had a duty to separate them.

 The negligence of the air traffic controllers and the two pilots all directly contributed in causing the plaintiff's injuries. A reasonable and just sum to fully compensate him therefor is $45,-000.00 and judgment in that amount, together with costs, will be entered against both defendants.

 The situs of the near miss being over Wisconsin, the law of that State applies. Each of the defendants by way of cross-claim seeks contribution from the other. Following the rule laid down in the late Wisconsin case on this subject, Bielski v. Schulze, 16 Wis.2d 1, 114 N.W.2d 105, the Court apportions the percentage of negligence between the defendants—sixty-five percent to the Government; thirty-five percent to Northwest Airlines, Inc.

Counsel for the plaintiff should prepare an appropriate judgment order in accordance with this memorandum opinion, submit it to counsel for the defendants for approval as to form, and present it to the Court for entry.