Robert F. WILLIAMS, Appellant,

v.

TRANS WORLD AIRLINES, Appellee.

No. 84, Docket 74–1469.

United States Court of Appeals, Second Circuit.

Argued Sept. 30, 1974.

Decided Jan. 10, 1975.

Harold L. Warner, Jr., New York City (Chadbourne, Parke, Whiteside & Wolff and Bennett H. Last, New York City, on the brief), for appellee.

Melvin L. Wulf, American Civil Liberties Union Foundation, New York City

(Norman Dorsen, New York City, on the brief), for appellant.

Before HAYS, ANDERSON and MANSFIELD, Circuit Judges.

ROBERT P. ANDERSON, Circuit Judge:

This is an appeal from the district court's decision[1] that defendant-appellee Trans World Airlines, Inc. (TWA) was well within its rights in refusing transportation by air to plaintiff-appellant Robert F. Williams (Williams) under 49 U.S.C. § 1511[2] and that TWA's refusal to carry Williams on a September 6, 1969 flight from London, England, to Detroit, Michigan for which he held a valid ticket, was not, under the circumstances of this case, arbitrary, or unreasonable, as Williams claims; nor did it subject him "to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever," as proscribed by 49 U.S.C. § 1374(b).[3]

The trial court found the facts to be substantially as follows: Williams, a black, native-born American citizen, had lived in Monroe, North Carolina, until he left his home August 27, 1961 for New York where he learned by radio on the afternoon of the following day that he had been indicted for alleged kidnapping in North Carolina and that a warrant had issued to the FBI for his arrest. To avoid prosecution he fled to Canada early in September, 1961 and after approximately six weeks, he left for Cuba and arrived there in November, 1961. He remained in Cuba until 1966, when he moved to Communist China, where he and his family lived for approximately two years. In 1969 he decided to return to the United States and surrender to the authorities, so he made a trip to Dar es Salaam, Tanzania where he obtained from the United States Embassy a travel document or limited passport good only for a return to the United States. He and his family left China in August, 1969, for Tanzania and his family flew from there to Detroit, Michigan later that month. Their arrival in Detroit was accompanied by a large demonstration at the airport.

On or about September 4, 1969, Williams purchased a ticket for air passage from Dar es Salaam to London, England via United Arab Airlines, and thereafter from London by direct flight to Detroit, Michigan on TWA. The ticket was issued in the name of "R. Franklin".[4]

Meanwhile, on August 28, 1969, Joseph E. Flaherty, Security Representative for TWA, received a telephone call from Special Agent John Sullivan of the FBI in New York who told Flaherty that Williams would be arriving at the Detroit airport on a TWA flight from London. He stated that there was a warrant outstanding for Williams' arrest, that he was a fugitive, and that there was a possibility of a demonstration when Williams arrived. The FBI therefore asked to have the aircraft parked somewhere other than at the passenger terminal or rerouted to another airport.

---

**1.** Williams v. Transworld Airlines, Inc., 369 F.Supp. 797 (S.D.N.Y.1974).

**2.** 49 U.S.C. § 1511, § 1111 of the Federal Aviation Act, entitled "Authority to Refuse Transportation", states that:

"Subject to reasonable rules and regulations prescribed by the Administrator, any air carrier is authorized to refuse transportation to a passenger or to refuse to transport property when, in the opinion of the air carrier, such transportation would or might be inimical to safety of flight."

**3.** 49 U.S.C. § 1374(b), § 404(b) of the Federal Aviation Act, states that:

"No air carrier or foreign air carrier shall make, give, or cause any undue or unrea-

sonable preference or advantage to any particular person, port, locality, or description of traffic in air transportation in any respect whatsoever or subject any particular person, port, locality, or description of traffic in air transportation to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

**4.** Williams said that the name on the ticket, "Mr. R. Franklin," was the result of a mistake made by the clerk at the United Arab Airlines office in Dar es Salaam, who incorrectly copied Williams' name from his "passport" which is in the name of "Robert Franklin Williams."

After receiving the call, Flaherty contacted Mr. Richard E. Newman, TWA Staff Vice-President, Audit and Security, and advised him of the FBI's request. He also told Newman that there had been a demonstration, consisting of some 300 people who went through the barrier and onto the field, four weeks earlier when Williams' wife arrived from Africa. In response to Newman's request for additional information, Flaherty sent him a copy of the FBI Wanted Bulletin describing Williams.[5]

Newman in turn gave to the President of TWA, Forward C. Wiser, Jr., all of the information about Williams which had been received from Flaherty. TWA Vice-President and General Counsel, Raymond Fletcher, later advised Newman and another TWA Vice-President that under the Federal Aviation Act the airline could refuse passage to Williams if he "would or might be inimical to safety of flight."

The ultimate decision to refuse Williams passage was made by Wiser, as president, on September 4, 1969. His decision was based on the FBI Wanted Bulletin including the information that Williams was a fugitive from an indictment on a kidnapping charge, and the warning it contained about Williams being armed and dangerous; the possibility of a demonstration upon Williams' arrival at Detroit; and the danger of hijacking in light of those recently experienced by TWA and other airlines.[6] Prior to this occasion Wiser had never heard of Williams but on September 6, 1969, he was aware that Williams might be taken into custody by the British authorities.

When Williams arrived in London on September 5, 1969, between 4 and 5 p. m., he first went through Immigration and then to the United Arab Airlines booth to arrange travel to Detroit. Upon finding no one there, he went to the TWA office and spoke to someone there about a flight to Detroit. When he returned to the Immigration gate to get his baggage he was approached by British Security Police who took him to a nearby room to question and search him. He was informed that it had been reported by the FBI that he was carrying arms and ammunition, but the search revealed nothing. Subsequent searches by other British officials also revealed no arms, ammunition or explosives.

At this point Williams was told that TWA had refused him passage to Detroit, although it offered to have him flown back to Cairo on United Arab Airlines, which Williams refused; and, because he had neither a United States passport which allowed him general foreign travel nor a British visa, he was taken to Pentonville prison as an illegal immigrant, where he remained until September 12, 1969. TWA tried to make Williams an offer to transport him to Detroit if he would consent to be accompanied by a legal attache of the United States Embassy in London but the proposal failed to reach Williams in time. Williams never gave consent to an alternative offer by TWA to fly him from London to New York on the 5th.

On September 11, 1969 TWA completed arrangements with Williams' attorney in Detroit, pursuant to which the attorney was flown to London; and on September 12, 1969, he and Williams were

---

5. The FBI Bulletin, though dated August 31, 1961, was currently outstanding in September of 1969. It bore a photograph of Williams and stated: "CAUTION. WILLIAMS ALLEGEDLY HAS POSSESSED A LARGE QUANTITY OF FIREARMS, INCLUDING A .45 CALIBER PISTOL WHICH HE CARRIES IN HIS CAR. HE HAS PREVIOUSLY BEEN DIAGNOSED AS SCHIZOPHRENIC AND HAS ADVOCATED AND THREATENED VIOLENCE. WILLIAMS SHOULD BE CONSIDERED ARMED AND EXTREMELY DANGEROUS."

6. TWA had, in 1969, experienced four hijackings prior to August, 1969, and a fifth hijacking at the end of August in which a TWA airplane was blown up while on the airport runway in Damascus, Syria, and some of the plane's passengers were held as hostages. Judge Levet took judicial notice in his opinion of the fact that approximately 41 hijackings of American planes occurred in the United States between September 6, 1968 and September 6, 1969. See 369 F.Supp. at 802, n. 3.

taken by TWA on a special unscheduled non-stop flight to Detroit. Upon arrival at the airport there, two FBI agents took Williams into custody.

Williams instituted suit on January 26, 1970 against TWA alleging, inter alia, that he was unjustly and unreasonably discriminated against in violation of § 404(b) of the Federal Aviation Act, 49 U.S.C. § 1374(b), false imprisonment and breach of contract. The other allegations of his complaint were withdrawn either prior to or during the trial. The three remaining counts can only succeed in the event that TWA was not authorized under 49 U.S.C. § 1511 to refuse to carry Williams on September 6, 1969, in accordance with the terms of his ticket. This is fully discussed in the trial court's excellent opinion.

■ The central issue in this case, therefore, is whether, as a matter of law, it was reasonable under the circumstances for TWA to refuse to transport Williams, who was the holder of a valid and confirmed ticket, on the flight in question. We hold that it was.

One of the greatest hazards besetting the commercial transportation of passengers by air in the past fifteen years has been the hijacking of passenger planes. Many lives have been lost and much suffering has been caused by this piratical practice, not to mention the disruption of plans and the frustrations, inconveniences and losses visited upon hundreds of people. This is well described in the first part of the discussion portion of the trial court's opinion. It is also discussed in Part I of this court's opinion in United States v. Bell, 464 F.2d 667 (2 Cir. 1972), which the trial court cited.

In order to meet this serious problem Congress enacted appropriate legislation. As an air carrier under the Federal Aviation Act of 1958, 49 U.S.C. § 1301 et seq., (the Act),[7] TWA was and is required to perform its services with the highest possible degree of safety in the public interest[8] and 49 U.S.C. § 1511 authorizes an air carrier to refuse transportation to a passenger "when, in the opinion of the air carrier, such transportation would or might be inimical to safety of flight." In implementation of this statute TWA filed with the Civil Aeronautics Board its Local and Joint Passenger Rules Tariff No. R–3, entitled "Limitations of Carrier", which was in effect at the time of TWA's refusal to carry Williams.[9]

---

**7.** § 1111 of the Federal Aviation Act (Public Law 87–197, 87th Cong., 1st Sess., approved September 5, 1961, 75 Stat. 466) was enacted by Congress as part of a comprehensive program aimed at combatting hijackings and other criminal acts committed on board aircraft. See 1 U.S.Code Cong. & Ad.News, 87th Cong., 1st Sess., pp. 520–522 (1961); 2 U.S. Code Cong. & Ad.News, 87th Cong., 1st Sess., pp. 2563–2582 (1961).

**8.** This duty has both a statutory and common law basis. § 601(b) of the Federal Aviation Act, 49 U.S.C. § 1421(b), states in relevant part:

"In prescribing standards, rules, and regulations, and in issuing certificates under this subchapter, the Administrator shall give full consideration to the duty resting upon air carriers to perform their services with the highest possible degree of safety in the public interest . . . ."

It has generally been held following state law that commercial air lines such as TWA are common carriers, and as such owe their passengers the duty of utmost care for their safety. See, e. g., Gatenby v. Altoona Aviation Corporation, 407 F.2d 443, 446 (3 Cir. 1968); United Air Lines, Inc. v. Wiener, 335 F.2d 379, 389 (9 Cir. 1964), cert. dismissed 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964); Cattaro v. Northwest Airlines, Inc., 236 F.Supp. 889, 894 (E.D.Va.1964); United States v. United Air Lines, Inc., 216 F.Supp. 709, 716 (D.Nev. 1962). But see Krasnow v. National Airlines, 228 F.2d 326 (2 Cir. 1955), holding that under New York law a common carrier of passengers for hire must only meet a standard of reasonable care under the circumstances. See 228 F.2d at 328.

**9.** Rule 8 of TWA's Tariff No. R–3, provides in pertinent part:

"(A) *Refusal, Cancellations or Removal*
(1) Carrier will refuse to carry, cancel the reserved space of, or remove enroute any passenger when, in the exercise of its reasonable discretion carrier decides:
(a) such action is necessary for reasons of safety;
(b) such action is necessary to prevent violation of any applicable laws, regulations, or orders of any state or country to be flown from, into or over;

The plaintiff has brought this action on the theory that TWA's authority under these statutes and implementing rules is severely limited by 49 U.S.C. § 1374(b), supra, which forbids an airline to subject a person to "unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatever." He asserts that before TWA could refuse to honor his ticket it must institute a thorough and complete investigation of the plaintiff's record, background and personal history. He argues that the FBI's statements about him that he was known to carry firearms, was schizophrenic and a dangerous person and that his arrival at the Detroit airport was likely to produce a mass demonstration could not be taken at face value by the TWA officials but should first have been subjected to a searching inquiry and thoroughly scrutinized to determine whether the conclusions of the FBI were founded in fact and were correct.

The main thrust of the appellant's case is that TWA had no right to rely upon the written and oral statements by the FBI and that, in order to give effect to the provisions of § 1374(b), it was required intensively to investigate the matters of which he was accused by the FBI and to make a thorough inquiry into his personal history as well. The appellant asserted that had TWA done so, it would have discovered that any charges of socially disruptive or hostile attitudes or conduct on his part and the representations made by the FBI stemmed entirely from false accusations made against him by white persons motivated by race prejudice in response to his lawful protests against race discrimination. To prove this, Williams' counsel at the trial persuaded the trial judge to receive into evidence testimony by Williams relating to the abuse of black persons and the denial of their rights in racially segregated communities. The trial judge expressed the opinion that it was irrelevant to the issues of the case, particularly because there was nothing whatever to show that TWA knew anything about any persecutions or groundless arrests or unfounded accusations directed against Williams when TWA decided that it would be inimical to security and to the safety of the flight to permit him to take passage on September 6th under the terms of his ticket. The trial court allowed Williams to give testimony, "just generally", concerning the adverse and hostile treatment which Williams said he had received or had observed because of race discrimination.

In its decision the trial court found, in effect, that there was no evidence to show that TWA, in refusing Williams passage on September 6th, took such action or was motivated in the slightest degree to do so, because of race prejudice or discrimination. The court concluded that, under the same circumstances, TWA would have taken the same action even if Williams had belonged to the yellow, white or brown races. It further held that TWA's action was not arbitrary or unreasonable.

Accepting as true all of the appellant's testimony concerning the harsh and corrosive circumstances of his early life and his later efforts to protest and correct them, his conflict with state authority and his experiences and activities as a

(c) the conduct, status, age or mental or physical condition of the passenger is such as to .
(i) require special assistance of carrier; or
(ii) cause him discomfort or make himself objectionable to other passengers; or
(iii) involve any hazard or risk to himself or to other persons or to property; or
(d) the passenger fails to observe the instructions of carrier.
(2) If question arises of any aircraft's being overloaded, Carrier shall decide in its reasonable discretion which passengers or articles shall be carried.

(3) Carrier will refuse to carry, or will remove at any point, any passenger who refuses to permit search of his person or property for a concealed deadly or dangerous weapon or article or explosives.
(4) Carrier will refuse to transport or will remove at any point, any passenger whenever such action is necessary to comply with any governmental regulation, or to comply with any governmental request for emergency transportation in connection with the national defense."

fugitive, there is no evidence that TWA was at any time influenced by race prejudice or discrimination in the slightest. Nor was there anything on the face of the information which TWA received from the FBI or any other sources, that was so absurd, bizarre, inaccurate, contradictory or so dubiously authentic as to put TWA on further inquiry as to the truth of the reports which it acted upon.

■ We are of the opinion that the findings and conclusions of the trial court were fully supported by the evidence before it and that TWA action in refusing to carry Williams on the flight for which he had a ticket, was not arbitrary or in any way motivated by racial or political prejudice, but was, under the circumstances, reasonable and fully authorized by 49 U.S.C. § 1511. In considering the interaction of this statute with 49 U.S.C. § 1374, on which the appellant so heavily relies, we are of the opinion that Congress did not intend that the provisions of § 1374 would limit or render inoperative the provisions of § 1511 in the face of evidence which would cause a reasonably careful and prudent air carrier of passengers to form the opinion that the presence aboard a plane of the passenger-applicant "would or might be inimical to safety of flight." Nor did Congress intend that, before refusing passage to such an applicant, an air carrier, faced with such a problem, be required, as the appellant asserts, to make a thorough inquiry into the intelligence received, its sources and an investigation of the personal history of the applicant.

■ Section 1511 expressly leaves the ascertainment of the necessity for denying passage to one seeking it, to the "opinion of the air carrier" within the terms of the statute. Congress was certainly aware that decisions under § 1511 would in many instances probably have to be made within minutes of the plane's scheduled take-off time, and that the carrier's formulation of opinion would have to rest on something less than absolute certainty. The statute did not contemplate that the flight would have to be held up or cancelled until certainty was achieved. The test of whether or not the airline properly exercised its power under § 1511 to refuse passage to an applicant or ticket-holder rests upon the facts and circumstances of the case as known to the airline at the time it formed its opinion and made its decision and whether or not the opinion and decision were rational and reasonable and not capricious or arbitrary in the light of those facts and circumstances. They are not to be tested by other facts later disclosed by hindsight.[10] This standard is consistent with the rules and regulations which § 1511 requires in implementation of its own provisions and are set forth in Rule 8, Tariff No. R–3, ante.

■ TWA, when it decided to refuse passage to appellant, was entitled to accept at face value the oral and written representations made by the FBI regarding Williams.[11] They were made offi-

---

10. 49 U.S.C. § 1511 is consonant with the common law rule that "where a carrier has reasonable cause to believe, and does believe, that the safety or convenience of its passengers will be endangered by a person who presents himself for transportation, it may refuse to accept such person for transportation and is not bound to wait until events have justified its belief." 14 Am.Jur.2d, Carriers § 865 at 309.

11. Generally speaking a "presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." United States v. Chemical Foundation, 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131

(1926). Under some circumstances, a similar presumption may be entertained by a common carrier. Thus it was held in Picking v. Pennsylvania R. Co., 151 F.2d 240 (3 Cir. 1945), reh. den. 152 F.2d 753 (3 Cir. 1945), that in light of the duty of a common carrier by railroad "to accept for transportation as passengers persons in the custody of peace officers under a warrant valid on its face . . . ", the "employees of a railroad company are not required . . . to constitute themselves a court of law in order to determine whether extradition proceedings were validly conducted" before complying with this duty. 151 F.2d at 253.

By analogy a common carrier has a right to presume that official representations made by

cially in the course of its duties by a recognized and authorized police force of the United States government, and there was nothing on the face of them or connected with them to put TWA on further investigation or inquiry. The fact that Williams was not actually armed and appeared amenable when he presented himself to board the TWA plane in London did not call for a change of opinion. Meyer v. St. Louis I.M. & S. Ry., 54 F. 116, 120 (8 Cir. 1893). Reports of hijackings indicate that the perpetrator need not necessarily be armed since he may feign possession of a weapon or join with a confederate to overpower members of the crew. Moreover, if some days or weeks later it were discovered that some of the oral or written statements made by the FBI were exaggerated or inaccurate or wrong, this would not furnish a basis for assertion of a claim against TWA which acted properly pursuant to § 1511.

Section 1374(b) cannot serve as a ground for recovery of damages by the appellant from TWA because an air passenger carrier which properly acts pursuant to § 1511 and solely within the framework of that statute to refuse passage to an applicant, cannot, *for those acts alone,* be held to be within the terms of § 1374(b) as a "carrier . . . [which] subject[s] any . . . person . . . to . . . unjust discrimination or . . . undue or unreasonable prejudice or disadvantage in any respect whatsoever."

■ The holding that TWA acted properly and reasonably, pursuant to the authority granted it in § 1511, in refusing passage to Williams precludes a recovery by him under either § 1374(b) (§ 404(b) of the Federal Aviation Act) or for breach of contract or for false im-

prisonment arising out of appellant's imprisonment by the London police.[12] Under the circumstances TWA more than amply fulfilled its obligation to transport Williams by air from London, England to Detroit, Michigan, within a reasonable time. Any damage suffered by him because of his enforced stay in London and his delay in reaching Detroit was not attributable to any negligent or unlawful act or omission or any malfeasance on the part of TWA.

The judgment of the district court is affirmed.

---

the FBI in the course of its duties are substantially true and accurate.

12. During the trial of this case the district judge charged the appellant, Williams, in a summary contempt proceeding and found him guilty. Williams in a separate appeal has challenged the contempt judgment, which this court has heard, considered, and ruled upon

in favor of Williams, 509 F.2d 949 (2 Cir. 1974). We conclude, however, that neither the contempt proceedings and judgment, nor the circumstances out of which they arose, had any adverse effect upon the fairness, completeness and validity of the findings, conclusions, and the judgment in this case of Williams v. TWA.