**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, and Captain Eugene L. Cochran, Petitioners,**

v.

**CIVIL AERONAUTICS BOARD, Respondent.**

Nos. 1050, 1051, Dockets 75–4049, 75–4055.

United States Court of Appeals, Second Circuit.

Argued April 23, 1975.

Decided May 27, 1975.

Daniel M. Katz, Washington, D. C. (Gary S. Green, Washington, D. C., on the brief), for petitioners.

David E. Bass, Atty., C. A. B., Washington, D. C. (Thomas J. Heye, Gen. Counsel, Glen M. Bendixsen, Associate Gen. Counsel, Robert L. Toomey, Atty., C. A. B., Washington, D. C., Thomas E. Kauper, Asst. Atty. Gen., Lee I. Weintraub, Atty., Dept. of Justice, Washington, D. C.), for respondent.

Louis J. Lefkowitz, Atty. Gen. of N. Y., Samuel A. Hirshowitz, First Asst. Atty. Gen., Philip Weinberg, John F. Shea, III, Asst. Attys. Gen., Walter Morris (Second Year Law Student, of counsel), for amicus curiae State of New York.

Lawrence W. Bierlein, Washington, D. C., for amicus curiae Council for Safe Transportation of Hazardous Articles.

Reuben B. Robertson, III, Washington, D. C., for amici curiae Aviation Consumer Action Project, and others.

Before LUMBARD, HAYS and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

The issues underlying this litigation are of considerable importance since they involve the transportation by air of hazardous materials and therefore the implicit menace to human life. The petitioners, the Air Line Pilots Association and an individual pilot (ALPA), have taken an active role in attempting to secure an overhaul of existing regulations and an effective inspection and enforcement program. The ALPA brief on appeal lists a litany of complaints which are not contested in the record before us. Under the Federal Aviation Act of 1958, 49 U.S.C. § 1301 et seq., safety regulations for the transportation of air cargo are the responsibility of the Department of Transportation (DOT) and the Federal Aviation Administration (FAA). 49

U.S.C. §§ 1421 & 1655. We note at the outset that neither agency is a party to this appeal. FAA regulations define "dangerous articles," which include explosive, flammable, corrosive, poisonous and radioactive materials. 14 C.F.R. § 103.1. In addition, the definition includes "hazardous materials," which are defined in DOT regulations. 49 C.F.R. Pts. 170–89. Since hazardous materials are shipped to and from air terminals by rail and motor carriers, all regulations for air transportation have to be integrated and correlated with other requirements applicable to those materials while transported by other modes of transportation. We are advised that the DOT/FAA regulations defining dangerous and hazardous materials alone take up some 280 pages of print and the packaging regulations consume over 360 printed pages.

Presumably, the hazardous materials when appropriately labelled and packaged can be transported safely by air. However, the ALPA brief on appeal, with copious and uncontested references to reports and testimony at congressional hearings,[1] contends rather convincingly that the regulatory scheme has been a dismal failure. In essence, shippers have failed to comply with existing regulations—whether because of their complexity, ignorance of their existence or perhaps because they are overbroad. Moreover, it is urged that neither the air carriers nor the agencies involved (FAA/DOT) have monitored or enforced the existing regulations.

### I.

As a result of the general dissatisfaction, several significant events have recently transpired:

1) The Congress enacted the Transportation Safety Act of 1974 (effective January 3, 1975), which declared that it was the policy of Congress to "improve the regulatory and enforcement authority of the Secretary of Transportation to protect the Nation adequately against the risks to life and property which are inherent in the transportation of hazardous materials in commerce." Pub.L.No. 93–633, § 102, 88 Stat. 2156, codified as 49 U.S.C. § 1801. The Act gives the Secretary broad powers in establishing criteria for handling hazardous materials, promulgating regulations, requiring shipper registration statements, conducting investigations and inspections, and establishing a technical staff. The statute further sets forth both civil and criminal provisions for violation and authorizes the Attorney General, at the request of the Secretary, to bring actions for equitable relief, as well as punitive damages, to redress violations of Title I (the hazardous materials provisions) and of rules or regulations issued thereunder. Moreover, the Secretary is mandated within 120 days of the effective date of the Act to issue regulations with respect to the transportation of radioactive material.[2]

2) As of February 1, 1975, ALPA initiated a program, Safe Transportation of People (STOP), which effectively barred from all passenger aircraft, and to some

---

1. Subcomm. on Investigations of the House Comm. on Interstate and Foreign Commerce, 93d Cong., 2d Sess., Report on Air Safety: Selected Review of FAA Performance (Subcomm. Print Jan. 1975); Special Panel to Study Transportation of Nuclear Materials, Joint Comm. on Atomic Energy, 93d Cong., 2d Sess., Report on Transportation of Radioactive Material by Passenger Aircraft (Joint Comm. Print Sept. 17, 1974); National Transportation Safety Board, Aircraft Accident Report on Crash of Pan American World Airways, Inc. Boeing 707, Boston, Mass., Nov. 3, 1973 (Dec. 2, 1974); Atomic Energy Comm., Recommendations for Revising Regulations Governing the Transportation of Radioactive Material in

Passenger Aircraft (July 1974); Hearings on S. 2064 Before the Senate Comm. on Commerce, 93d Cong., 2d Sess. (June 12–14, 1974); Hearings on Transportation of Hazardous Materials by Air Before a Subcomm. of the House Comm. on Government Operations, 93d Cong., 1st Sess. (March 14–15 & April 5, 1973); Hearings on Transportation of Hazardous Materials Before a Subcomm. of the House Comm. on Government Operations, 92d Cong., 1st & 2d Sess. (Nov. 17 & Dec. 1, 1971, and June 28, 1972).

2. The DOT/FAA has promulgated such regulations, effective May 3, 1975. 40 Fed.Reg. 17141 (April 17, 1975).

extent cargo planes, all hazardous and dangerous materials as defined in existing FAA and DOT regulations; under the STOP program, ALPA pilots would not fly any planes on which hazardous materials were carried. Certain critical medical supplies, dry ice used to refrigerate perishable goods, and magnetic materials, when properly marked, labelled, packaged, segregated, loaded and stowed, were excepted from the STOP program. ALPA has announced that air carriers, labor organizations and shippers have cooperated with the STOP program and that not a single pilot has been disciplined for his refusal to fly hazardous material.

3) A number of airlines filed notices of embargo pursuant to regulations of the respondent Civil Aeronautics Board (CAB), 14 C.F.R. § 228.1 et seq., in which they announced their refusal, as of February 1, 1975, to carry hazardous materials, with exceptions generally in line with those exempted from the STOP ban. In general, the airlines involved announced that their reason for the embargo of hazardous materials was not only their dissatisfaction with the adequacy and enforcement of safety regulations governing the transportation of such cargo, but also their inability to carry such materials because of the refusal of ALPA members, in accordance with STOP, to fly aircraft with hazardous freight.

## II.

With this background in mind, we approach the rather narrow issue posed by this appeal. On February 10th and 14th, 1975, DOT, pursuant to 14 C.F.R. §§ 302.201 and 302.502, made formal complaints to the CAB against the transportation restrictions of the airlines.[3] The DOT argued essentially that the DOT/FAA were vested with exclusive regulatory jurisdiction with respect to the transportation by air of hazardous materials; that the FAA, pursuant to the authority delegated by the Secretary of Transportation, had promulgated uniform regulations concerning the air transportation of such cargo, 14 C.F.R. Pt. 103; that because of such regulations individual carriers were precluded from ad hoc regulations; that under the Transportation Safety Act of 1974 the Secretary of Transportation had been recently vested with broad new authority, and, pursuant thereto, the Secretary was obligated to promulgate additional regulations which must prohibit on passenger-carrying aircraft the transportation of radioactive materials, except those used in or incident to research or medical diagnosis or treatment, provided that such materials do not pose an unreasonable hazard to health and safety, 49 U.S.C. § 1807(a); that the FAA has prescribed regulatory procedures (14 C.F.R. Pt. 11; see also 5 U.S.C. § 553) permitting carriers and other persons to challenge any category of hazardous materials otherwise presently permitted to be shipped by air; and that none of the respondent airlines had petitioned the FAA for rule making with respect to the transportation of such cargo. The DOT concluded that the embargoes of the airlines violated their common carrier responsibilities and created an unjust discrimination or undue or unreasonable prejudice or disadvantage in violation of 49 U.S.C. § 1374(a) & (b).

On February 25, 1975, ALPA responded in opposition to the DOT's complaints, urging that, until that agency exercised its new responsibilities under the Hazardous Materials Transportation Act of 1974 (Title I of the Transportation Safety Act of 1974) and undertook an effective program of education, inspection and enforcement, the regulations would be ignored or misapplied by the shippers of hazardous freight and the STOP pro-

---

**3.** The DOT's first complaint was filed in opposition to the restrictions upon transport of goods of the following nine airlines: Alaska Airlines, Inc., Allegheny Airlines, Inc., Delta Air Lines, Inc., Eastern Air Lines, Inc., Frontier Airlines, Inc., Hughes Airwest, Ozark Air Lines, Inc., Trans World Airlines, Inc., and United Air Lines, Inc. The second complaint was filed against the following five airlines: American Airlines, Inc., Continental Air Lines, Inc., Hawaiian Airlines, Inc., Piedmont Aviation, Inc., and Western Air Lines, Inc.

gram would therefore have to remain in force. Moreover, ALPA, citing 49 U.S.C. §§ 1421 & 1511, insisted that the carriers and the pilots have the right to impose higher safety standards than the "minimum safety standards" set by DOT/FAA and have the right to decline to accept freight deemed to be unsafe.

On February 28, 1975, the CAB adopted Order No. 75–2–127, which rejected the "embargo notices" filed by nine of the carriers. The Board noted that the primary responsibility for the regulation of the transportation of hazardous materials by air rested with the DOT and FAA; that the embargoes were "in complete divergence with the FAA regulations and any proposals or legislation to modify them; " that the embargoes were in derogation of the carriers' common-carrier obligation to carry cargo; and that the Board did not consider that its embargo regulations "embrace the matters set forth in the above noted embargoes."

ALPA then filed a petition for reconsideration and for a stay of the Board's order. Before the CAB responded, ALPA filed a petition for review of the order and motion for a stay with this court on March 13, 1975. Subsequently, on March 19, 1975, the CAB adopted Order No. 75–3–61, which denied ALPA's request for a stay but deferred action on the petition for reconsideration of Order No. 75–2–127 in order to allow the parties and interested persons an opportunity to respond to the petition. On March 25, 1975, this court granted petitioner's motion for an expedited appeal and granted a stay of CAB Order No. 75–2–127. That court order further provided that, until the determination by this court of this appeal, "the Civil Aeronautics Board, its officers, employees, and agents shall cease and desist from un-

lawfully interfering with the right of air carriers and their employees to refuse to transport property which, in the opinion of such air carriers and their employees, may be inimical to safety of flight."

On April 15, 1975, the CAB adopted Order No. 74–4–75, which denied ALPA's petition for reconsideration of Order No. 75–2–127, rejected the embargoes of certain airlines not disposed of by Order No. 75–2–127, and denied the applications of most of the carriers that the embargoes be extended.[4] In accordance with this court's stay, the CAB has deferred the effective date of its order pending the determination of this appeal.

### III.

The sole issue before us is whether the CAB order rejecting the airline embargoes was properly issued.[5]

On this appeal, the CAB principally argues that its embargo regulations are inapplicable to the carriers' blanket refusal to carry hazardous materials. We note that none of the airlines that filed embargo notices with the CAB has petitioned this court for review of the order of rejection. We reiterate that the contentions of ALPA[6] are directed against the claimed failures of DOT and FAA to exercise their statutory obligations to regulate effectively the air transportation of hazardous cargo, but that neither agency has been made a party to this appeal. At this juncture at least, it is quite evident that the issue before us is primarily procedural and is only peripherally related to the question of effective regulation of hazardous material in flight.

The embargo regulation in issue provides as follows:

"Embargo" means the temporary refusal by an air carrier to accept for transportation over any route or seg-

---

4. The applications for extensions from the following airlines were denied: Alaska Airlines, Inc., Allegheny Airlines, Inc., American Airlines, Inc., Delta Air Lines, Inc., Eastern Air Lines, Inc., Frontier Airlines, Inc., Hawaiian Airlines, Inc., Hughes Airwest, Ozark Air Lines, Inc., Piedmont Aviation, Inc., United Air Lines, Inc. and Western Air Lines, Inc.

5. The only order on review here is Order No. 75–2–127. See footnote 7 infra.

6. Although ALPA did not file the embargo notices here, it is clearly a person having a "substantial interest" in the order which rejected them. 49 U.S.C. § 1486(a). The CAB has not contended otherwise.

ment thereof, or to or from any area or point of a connecting carrier, any commodity, type or class of property (other than passenger baggage) duly tendered, where, because of lack of facilities or personnel, or because it is required to give preference or precedence to other traffic entitled to priority, or because of other compelling reasons not within the control of the carrier, it is temporarily unable to perform all of the authorized transportation service requested of it. Refusal to accept property for transportation in accordance with restrictions and· limitations in the tariff or the certificate of an air carrier shall not be deemed an embargo.

14 C.F.R. § 228.1.

The CAB emphasizes that on its face the embargo regulation applies to situations in which a carrier is "temporarily unable" to transport freight for "compelling reasons not within the control of the carrier . . . ." The temporary and emergency nature of the embargo seems to be implicit in the regulations themselves. Thus, an embargo becomes effective as of the date provided in the notice by the carrier without any CAB action; its duration is 30 days and any extension requires CAB authority. 14 C.F.R. § 228.2. When the embargo regulation was reissued in 1973, the CAB noted that an embargo is "in substance, a temporary disability of an extraordinary nature which prevents the carriage of all freight, or particular classes of freight, between specified points," and further, "a prolonged refusal to carry property, or particular types of property, is a matter necessitating a tariff filing rather than an embargo."[7] 38 Fed.Reg. 4241,

4243 n.10 (Feb. 12, 1973) (footnote added).

The inability or refusal of the carriers here can hardly be described as temporary. It has persisted since February 1st and presumably will continue until such time as the carriers and ALPA are satisfied with DOT and FAA regulation.[8] The CAB further urges that the embargo provision properly contemplates an inability to transport on the part of carriers rather than a refusal to do so. It is true that the carriers urged their inability to transport due to the refusal of pilots to carry hazardous materials. It is a fact, however, that the carriers also cited in the embargo notices their own displeasure with existing DOT and FAA regulation and enforcement. This would support the position that at least we are dealing with a combination of disinclination and disability. It would seem logical, therefore, that, if there is carrier objection to the present regulations, the appropriate remedy is carrier participation in a rule-making procedure, which, on the record before us, the carriers have utterly failed to seek.

 We also point out that the question of whether or not the embargo device utilized here by the airlines is procedurally appropriate involves an interpretation and construction of CAB rules, and the position of the CAB therefore deserves judicial deference. Bowles v. Seminole Rock Co., 325 U.S. 410, 413–14, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); Air Line Pilots Ass'n v. FAA, 147 U.S.App. D.C. 209, 454 F.2d 1052, 1054 (1971). We note again the acquiescence of the carriers who filed the embargo notices in the agency determination. We conclude,

---

7. A number of airlines have filed tariffs embodying restrictions on the transportation of goods similar to those contained in the rejected embargoes. The CAB rejected these tariffs in Order No. 75–4–75. That order is not on review here. A motion to consolidate the petition for review of Order No. 75–4–75 with the petition of ALPA in this case was denied by this court on May 12, 1975. Apparently, the tariff question will be considered in review proceedings pending in the District of Columbia Circuit, Delta Air Lines, Inc. v. CAB, No. 74–1984.

8. In its response to the complaints of the DOT against the embargoes of the carriers, ALPA stated that "until DOT undertakes an effective inspection, education and enforcement program with respect to its overly complex restricted articles regulations, these regulations will continue to be largely ignored or misapplied by those working with them, as proved by ALPA and acknowledged by the government on many occasions and the STOP program will therefore need to remain in force."

therefore, that the CAB properly rejected the airline embargoes as inappropriate and inapplicable under the circumstances set forth.[9]

ALPA has advanced a further argument which we think merits consideration. It is urged that the DOT and FAA regulations with respect to hazardous and dangerous materials merely establish minimum safety standards with which shippers must comply before such materials can in any event be transported by air. However, the argument runs, the air carriers and their employees have the right to surpass the minimum requirements and may lawfully refuse to carry freight which, in their opinion, is inimical to the safety of flight. (ALPA urges that this right of the airline and its personnel to refuse to carry dangerous freight is provided specifically by 49 U.S.C. §§ 1374(a) and 1511(a)).[10] ALPA thus maintains that the CAB rejection of the embargoes constitutes an unlawful interference with this carrier and pilot right which has been exercised in Operation STOP.

The position taken by DOT in its complaint against the embargoes in question was that the FAA has exclusive jurisdiction to regulate safety in air commerce and that "individual carriers are legally precluded from engaging in *ad hoc* regulation of the transportation of those [hazardous] materials in derogation of the statutory authority and responsibility of the DOT/FAA." Complaint of the DOT, filed Feb. 10, 1975, at 3. The CAB's position is more moderate. In the order denying ALPA's request for a stay of Order No. 75–2–127, the Board stated:

> We need not and do not here reach the question of the extent of the authority of an air carrier to refuse to carry a particular shipment of hazardous goods based upon circumstances relating specifically to that shipment.

Order No. 75–3–61, at 4 n.4. The CAB noted that it would abrogate its statutory responsibilities to the shipping and consuming public if it sanctioned "pervasive refusals to carry shipments required by the public." Id. (footnotes omitted).

■ While section 1374(a) does mandate that the air carrier provide the service authorized by its certificate, section 1511(a) provides that the carrier may refuse to transport passengers or property "when, in the opinion of the carrier, such transportation would or

---

9. The argument of one amicus that the CAB was either powerless to reject the embargoes or at best could only do so after a hearing is not persuasive. 14 C.F.R. § 228.4(h) provides that any interested person may make a formal or informal complaint against the embargoes. The DOT made such a complaint here and it is apparent that the CAB should have the power to act upon the complaint. See id. § 302.201. Even in the absence of a complaint, if the embargo notices failed to comply with the formal provisions of section 228.4 it would seem to be implicit that the agency would have the power to reject them. There is no provision in the rules for a hearing and, in view of the temporary nature of the embargo, it is hardly appropriate. In any event, there is no disputed question of fact here which would require a hearing.

10. Section 1374(a) provides in pertinent part as follows:

(1) It shall be the duty of every air carrier to provide and furnish interstate and overseas air transportation, as authorized by .its certificate, upon reasonable request therefor and to provide reasonable through service in such air transportation in connection with

other air carriers; to provide safe and adequate service, equipment, and facilities in connection with such transportation . . . .

Section 1511(a) provides:

The Administrator shall, by regulation, require any air carrier, intrastate air carrier, or foreign air carrier to refuse to transport—

(1) any person who does not consent to a search of his person, as prescribed in section 1356(a) of this title, to determine whether he is unlawfully carrying a dangerous weapon, explosive, or other destructive substance, or

(2) any property of any person who does not consent to a search or inspection of such property to determine whether it unlawfully contains a dangerous weapon, explosive, or other destructive substance.

Subject to reasonable rules and regulations prescribed by the Administrator, any such carrier may also refuse transportation of a passenger or property when, in the opinion of the carrier, such transportation would or might be inimical to safety of flight.

It is obvious from the face of the latter section that Congress's chief concern in enacting it was to provide a protection against the danger of hijacking.

might be inimical to safety of flight." This court has recently held that "Congress did not intend that the provisions of § 1374 would limit or render inoperative the provisions of § 1511 in the face of evidence which would cause a reasonably careful and prudent air carrier of passengers to form the opinion that the presence aboard a plane of the passenger-applicant 'would or might be inimical to safety of flight.'" Williams v. Trans World Airlines, 509 F.2d 942, 948 (2d Cir. 1975). *Williams* is instructive here. The plaintiff, according to FBI records, was an extremely dangerous schizophrenic with a criminal background of armed violence. At the time of his application for passage to the United States from London on Trans World Airlines, Williams was a fugitive from an indictment on a kidnapping charge. There was known to be a possibility of a demonstration at the airport on his return to this country. In light of these facts, presented to TWA by the FBI, TWA's refusal to grant him air passage was not only reasonable, but any contrary position would be absurd at best. However, acceptance of the view that an air carrier or a pilot [11] has the right to refuse to accept a passenger or cargo which constitutes a menace or the possibility of a threat to the safety of the flight is hardly dispositive of the issue before us. The ALPA argument is that the rejection of the embargoes here filed by the carriers constitutes a violation of section 1511(a). In the first place, if section 1511(a) provided the broad discretion claimed by ALPA, one wonders why the airlines sought the embargo in the first place. Secondly, of course, we cannot characterize the embargoes proposed here as constituting ad hoc determinations by carriers or carrier personnel that a *particular* cargo constitutes any special menace or potential for harm. The embargoes, which, in essence, conformed to the ALPA boycott, in effect barred *all* materials marked and labelled as hazardous in accordance with existing regulations. The *Williams* case, which merely sanctioned the right of the carrier to reject a putative passenger on the basis of intelligence that he was dangerous and had a propensity for violence, a criminal background and a history of mental instability, cannot, in our view, be supportive of the proposition that the broad interdiction of cargo embraced in the embargoes is in conformity with section 1511(a).

The very language of that section belies the ALPA position. The statute which authorizes the refusal of the carrier to transport property which would or might be inimical to safety of flight is prefaced by the clause "Subject to reasonable rules and regulations prescribed by the Administrator . . . ." There are rules which apply to the carriage of hazardous materials, and it is implicit in these rules that such goods, marked, labelled, packaged and stowed in accordance with such rules, are not inimical to flight safety in the judgment of the agencies charged by the Congress with the responsibility of making these determinations. The premise that the airlines have the right to disregard the entire regulatory scheme is not only violative of the language of section 1511(a) but of common sense as well. Individual carrier or pilot decision could only lead to administrative chaos unless, under the factual pattern exemplified by *Williams,* there is an ad hoc determination that some particular freight for some specific reason presents a peril to safe flight.[12]

The legality of the STOP operation is not before this court. No one here seeks to challenge or enjoin it. While we may well deplore the failure of the airlines to seek relief by participating in the rule-making processes of the DOT and FAA, we must commend ALPA for its involvement, as well as its sensitivity to the problem. At the same time, we would

---

11. 14 C.F.R. § 91.3(a) provides that the "pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft." See also 14 C.F.R. §§ 121.597(b) & 121.663.

12. ALPA argues that the effect of section 1511(a) is merely to deny carriers the right to

accept for transportation hazardous materials which fail to comply with FAA safety rules. In our view, this is a misinterpretation of the section. There is no right to accept non-conforming hazardous materials and thus no need to restrict the right.

be remiss if we did not point out that ALPA's petition emphasizes that shippers generally are unaware of the hazardous materials regulations which are governing here. Presumably, a large quantity of freight which is dangerous or hazardous is shipped unlabelled or unmarked. However, neither STOP nor an embargo precludes the passage of this cargo. They only penalize those who obey the regulations and properly package and label their materials. In fact, they may encourage evasion of regulation, which is hardly in the interest of air safety.

This court is not insensitive to the perils involved in this area but we have before us only the question of the legitimacy of the airline embargoes. We must also point out that Congress has responded to criticisms of the Government's dangerous materials program by enacting the Transportation Safety Act of 1974, which has only been in effect since January 3, 1975. The DOT, we are advised, has a ·task force presently at work revising the rules and strengthening their inspection and enforcement provisions. In view of the facts which this litigation has revealed about the effectiveness of the existing rules, we trust that that endeavor will be expeditious and effective.

Petitions denied.