Emily GERMAN–BEY, now known as Emily Bempah, Plaintiff,

v.

NATIONAL RAILROAD PASSENGER CORPORATION and Richmond, Fredericksburg and Potomac Railroad Company, Defendants.

No. 78 Civ. 3202 (KTD).

United States District Court,
S. D. New York.

Aug. 18, 1982.

Greene, Bogan, Lenoir, Jones & Guzman, New York City, for plaintiff; Juan Kip Lenoir, New York City, of counsel.

Bleakley, Platt, Schmidt & Fritz, New York City, for defendants; Hyman Hillenbrand, Lloyd H. Baker, New York City, of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

En route by passenger train from her New York home to her mother's house in South Carolina, plaintiff Emily Bempah was slashed in the face by a man wielding a pocket knife. She instituted this diversity action against the National Railroad Passenger Corporation ("Amtrak"), a District of Columbia corporation, and the Richmond, Fredericksburg and Potomac Railroad Company ("the Richmond"), a Virginia corporation, alleging negligence and breach of warranty on the part of defendants as the proximate cause of the injuries she suffered from the slashing. Her complaint seeks one million dollars for physical and psychological injuries. In addition, she seeks $25,000 for loss of earning capacity due to disabilities stemming from her injuries. Although acknowledging that plaintiff was slashed aboard their train, defendants deny any liability therefor.

Beginning June 2, 1982, a two-day non-jury trial was held before me on the issues of defendants' liability and plaintiff's damages. The following shall constitute my findings of fact and conclusions of law.

### I.

The resolution of the question of liability proceeds from certain facts which are undeniable. On Saturday, August 20, 1977, Ms. Bempah and her two infant children were traveling from New York City to Charleston, South Carolina to see Ms. Bempah's mother. They were peacefully sitting in their assigned seats in car 8315 aboard Amtrak's Silver Meteor train when the attack occurred somewhere outside of Alexandria, Virginia. They did absolutely nothing to provoke the attack by the other passenger, one Robert Sweadner.

The focus of this phase of the inquiry at trial was the condition of Sweadner when he boarded the train and the activities of railroad personnel immediately before and after the incident in question.

Robert Sweadner was drunk when he boarded the train in Washington, D. C. He had obtained a ticket but had failed to obtain a reservation for a seat on the train although all seats were supposedly reserved. On the platform at Washington, Sweadner, reeking of alcohol, sought out the train conductor and explained that he had no reservation. The conductor told Sweadner that he could nevertheless get on board the train. The conductor, although denying it at trial, knew or should have known that Sweadner was drunk. After talking to the conductor, Sweadner encountered Alston Scott, one of the railroad's service attendants who directed Sweadner to the car in which Ms. Bempah and her children were seated. Scott recognized that Sweadner was under the influence of alcohol and guided Sweadner to the rear seat which Scott usually occupied during the train ride.

Shortly thereafter, Scott left Sweadner and the other passengers in the car to their own devices, and at the instruction of the conductor, Scott joined the other attendants in the dining car for supper. The dining car was a number of cars forward of the car in which Ms. Bempah was attacked. Meanwhile, the conductor and the assistant conductor had gone back to the baggage car for some unknown reason.

Sweadner had brought a pint bottle of Vodka with him on the train. In less than half an hour between 8:59 p. m. when the train left Washington, D. C. and the time it left Alexandria, Virginia, Sweadner finished the whole bottle of Vodka. Although there is no direct evidence as to when he drank the Vodka, the only reasonable inference that I can draw is that it was consumed between the time he boarded the train and the time of the incident. Furthermore, there is no indication of how

Sweadner ingested the alcohol, but the inference is that he gulped it directly from the bottle. None of the train personnel could tell how or when it was done since all of them had absented themselves from the car where the drunken Sweadner sat. The other passengers were forward of Sweadner and no one apparently noticed his guzzling.

Sweadner left the seat into which Scott had guided him and made his way to the forward end of the car to where Ms. Bempah and her children were seated. He sat beside Ms. Bempah's small daughter and mumbled something. Ms. Bempah noticed something very wrong with Sweadner and she squeezed her daughter into the same seat to which she had been assigned. Sweadner then made his way back to the seat to which Scott had originally guided him.

Soon thereafter, the effect of the alcohol took hold of Sweadner. He got out of his seat cursing and shouting racial epithets and stumbled the full length of the car frightening the other passengers. He then pulled out a pocket knife, staggered up to Ms. Bempah and slashed her at least twice striking her hand and her face.

None of the train personnel were present to aid or protect Ms. Bempah. Some of the other passengers, however, tried to help her. They apparently gave wide berth to the violent drunken Sweadner who returned to the seat in the back of the car and hid the knife in the seat cushion.

Meanwhile, Ms. Bempah attempted to get her children out of the car obviously fearing that Sweadner might return and harm them. She fled with her children immediately to the next car forward. There, another passenger took charge of the children and yet another tried to calm the plaintiff. Someone else went seeking the train personnel. In her hysterical flight, Ms. Bempah ran another car forward where she was finally convinced to sit down so that she could be helped. One of the passengers there got some paper towels from the bathroom and wet them in cold water to use as a cold compress.

A passenger located the service attendant Scott in the dining car and told Scott of what had happened. Scott immediately came to where Ms. Bempah had fled. Scott had been trained in first aid, but, contrary to the railroad's rules that each car have a first aid kit, there was no kit aboard the train except back in the conductor's case in the baggage car. As a result, all Scott was able to do was to continue applying wet paper towels to the wounds. Scott had sent another service attendant to seek out the conductor who finally came up about fifteen minutes later to where Ms. Bempah was located from a baggage car about 16 cars behind. The conductor sent a radio message to the next station stop that an assault had been committed. He requested police help and an ambulance at the next scheduled stop.

Scott and the conductor made their way back to where Sweadner was seated and detained him there. They found the knife and an empty pint bottle of Vodka. About twenty minutes later, the train stopped at Fredericksburg, Virginia where Sweadner was arrested and Ms. Bempah was taken by ambulance to the hospital. There, she received multiple stitches to her face and hand.

After receiving treatment at the hospital, Ms. Bempah went to the police station to identify Sweadner. He was formally arrested, and, although Sweadner had had several hours to sober up, the arresting officer noted his drunken condition.

The conductor of the Silver Meteor testified at trial. He is a pleasant, elderly man, now retired after many years of loyal service to the railroad. To the extent that my findings of fact differ from his version, I find his testimony unbelievable. This is not to suggest that he was malicious or intentionally untruthful. It merely is a recognition that his viewpoint was warped by the railroad's (actual but unofficial) policy that a conductor's prime responsibility is to get the equipment over the assigned route on schedule while the safety and comfort of the passengers is relegated far down the list of priorities. This is borne out not only by the demeanor of the conductor but also by his incredible assertion that he did not ob-

serve that Sweadner was drunk when he was turned over to the police, despite guarding Sweadner approximately twenty minutes prior to the stop at Fredericksburg. The police officer who took Sweadner into custody at Fredericksburg had no such trouble noticing that Sweadner was inebriated; the officer stated in his report, "when the defendant, Sweadner, had a smell of alcohol on his breath and his eyes were very blood shot and watery."

Alston Scott testified that the assailant appeared intoxicated and his speech was slurred even at the time he came on the train in Washington. Counsel for the defendants attacked the credibility of Alston Scott and indeed would have me reject his testimony. I find that Scott was truthful.

## II.

A common carrier, such as Amtrak, has a duty to use a high degree of care for the safety of its passengers.[1] *Nieves v. Manhattan and Bronx Surface Transit Operating Authority*, 31 A.D.2d 359, 297 N.Y.S.2d 743 (1st Dep't), *appeal denied*, 24 N.Y.2d 1030, 302 N.Y.S.2d 852, 250 N.E.2d 253 (1969). Although a carrier is not an insurer of safety, it has a duty to take reasonable measures to protect passengers from injuries inflicted by other passengers. *Shernov v. New York City Transit Authority*, 79 A.D.2d 1021, 435 N.Y.S.2d 55 (2d Dep't 1981), *aff'd sub. nom. Weiner v. Metropolitan Transp. Authority*, 55 N.Y.2d 175, 448 N.Y.S.2d 141, 433 N.E.2d 124 (1982). The issue in this case is whether Amtrak took reasonable precautions to prevent danger from vicious acts of third parties. In order to be held liable, Amtrak must either have known of the dangerous condition or have been afforded a reasonable opportunity to learn of it.[2] Amtrak argues that there is no evidence in the record supporting plaintiff's allegations that any of its employees had notice that Sweadner was intoxicated or in any way prone to violence. In particular, Amtrak asserts that none of the passengers on board the train complained of the threat posed by Sweadner, and as a result, Amtrak had no reason to believe a dangerous condition existed. Amtrak's version of the incident is summarized as follow: "Within a few minutes after passenger Sweadner was observed in a peaceable position in his seat without any complaint from fellow passengers, for some unknown reason, suddenly and without warning, Sweadner pulled out a knife and ran screaming down the aisle of the car and slashed the plaintiff." Defendants' Proposed Findings of Fact and Conclusions of Law, ¶ 22. It is submitted that under these circumstances Amtrak acted well within the scope of its duties.

---

1. The parties have not argued to me which states' law should be applied in this case. Plaintiff's brief cites only New York cases, and defendants' brief cites cases which apply the law of New York, Florida, North Carolina, California, Georgia, Massachusetts and the Warsaw Convention. Because this is a diversity case, New York choice of law rules apply. New York courts generally take a case by case approach to this question and have in the past placed emphasis on a state's governmental interest. *See Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963). This case involves an incident in Virginia involving a Virginia defendant and a District of Columbia defendant. Plaintiff, however, is a New York resident and boarded the train in New York with a round trip passage to South Carolina. Under these circumstances and in view of the fact that New York is a major conduit for Amtrak passenger trains, I believe New York has interest strong enough such that a New York court handling this controversy would apply its own law.

2. The cases cited by defendants in their trial memorandum do not contradict this standard of liability. Defendants' cite five New York cases involving assaults by third parties against passengers where the court ruled in favor of the defendant carrier. In at least four of these cases, however, a negligence standard similar to the one applied here (*i.e.*, grounded in a carrier's notice of the imminent danger) is explicitly followed by the court. *See Zimmet v. City of New York*, 158 N.Y.S.2d 356 (Sup.Ct. 1956); *Drew v. Troy Fifth Avenue Bus Co., Inc.*, 9 A.D.2d 587, 189 N.Y.S.2d 637 (3d Dep't 1959); *Scalise v. City of New York*, 2 A.D.2d 984, 157 N.Y.S.2d 620 (2d Dep't 1956); *Duner v. Hudson & M. R. Co.*, 264 App.Div. 229, 35 N.Y.S.2d 191 (1st Dep't 1942). In the fifth New York case cited by defendants, the court's reasoning is not set out in a formal opinion. *Craig v. New York Central Railroad Co.*, 248 App. Div. 557, 287 N.Y.S. 407 (1st Dep't), *aff'd*, 272 N.Y. 610, 5 N.E.2d 356 (1936).

■ Defendants' version of the facts belie the credible evidence adduced at trial. From my earlier recitation of the facts, I find it clear that the railroad breached its obligations to Ms. Bempah to provide for her safety. The conductor either knew or should have known that Sweadner was drunk when Sweadner approached him in Washington. The conductor could have refused to permit Sweadner to board the train either because Sweadner had no reservation or more appropriately because Sweadner was intoxicated. Amtrak regulations provide that a conductor may refuse passage to a person under the influence of alcohol, even one with a proper ticket and reservation.[3]

Having decided to permit Sweadner to board the train the railroad compounded its breach of duty by leaving him without supervision when they knew he could become dangerous to himself or others. *See Williams v. Transworld Airlines, Inc.,* 369 F.Supp. 797 (S.D.N.Y.1974), *aff'd*, 509 F.2d 942 (2d Cir. 1975). If the conductor had stayed with Sweadner, or detailed one of the railroad personnel to monitor him, Sweadner's strange behavior would have been curtailed before he could inflict any injury. Sweadner should not have been permitted to roam at will through the train much less permitted to drink himself into a violent state. Sweadner should not have been permitted to annoy Ms. Bempah and her children or to charge through the full length of the car shouting obscenities and racial epithets. None of these things would have occurred if the railroad personnel had, at the very least, made frequent checks of the car where Sweadner imbibed. In sum, if Amtrak had fulfilled its duty to monitor Sweadner, then no injury would have been inflicted on the plaintiff.

■ A railroad perhaps can lawfully carry inebriated passengers. But when the railroad undertakes to do so it must safeguard the other passengers from the real hazards posed by a drunk. Here, the railroad cavalierly failed to do so and is therefore liable for injuries caused thereby.

### III.

Having found that the defendants are liable, I must now determine the extent of the injuries proximately caused by defendants' breach of duty and the extent of damages to be awarded.

■ Upon seeing Ms. Bempah, it was evident that her face had been severely gashed. The scars that remained almost four years after the incident were easily visible. This injury obviously caused substantial pain and suffering to Ms. Bempah. Aside from the pain, I cannot overlook the permanency of plaintiff's scar. According to Dr. Clark who examined her, Ms. Bempah has a skin condition which prevents the healing of scar tissue and which renders plastic surgery impracticable.

The measure of recovery for pain and suffering is fair and reasonable compensation, to the extent that injuries, pain and suffering can be translated into dollars. *See Mileski v. Long Island R. R. Co.,* 499 F.2d 1169 (2d Cir. 1974). Following this general rule, I award plaintiff $20,000 for the physical pain and suffering caused by her injury.

■ The mental anguish arising from this unfortunate incident is more difficult to assess in monetary terms. The evidence at trial, however, showed that the plaintiff suffered from a psychological trauma. This psychological trauma manifested itself on the day after the incident. After the defendant arranged for plaintiff and her children to stay at the Holiday Inn in Fredricksburg, an offer was made to put her on

---

3. Amtrak's On Board Service and Conductor's Rules state:

> Conductors must not permit persons to board the train who are not in condition to take care of themselves (unless accompanied by others who are competent to take care of them) or whose conduct might endanger their own lives or jeopardize the safety or comfort of other passengers on the train. Conductors must not permit disorderly conduct or profane or improper language on the train. *They must not allow visibly intoxicated or disorderly persons to board the train.* (emphasis added)

a train to complete the journey to Charleston. She was so stricken by phobia that she was unable to board any train. Eventually, she was driven to Washington, D. C. and completed her journey to South Carolina by plane. Upon her return to New York, she went to the Morrisania Care Clinic in the Bronx to consult with a general physician, a plastic surgeon and a psychiatrist.

Both parties' psychiatric experts testified that the incident was a traumatic experience for the plaintiff that left her with exaggerated fears and inhibitions. Plaintiff testified that this trauma resulted directly in an abject fear of subways, trains and people in general. Ms. Bempah stated that she had to resign from her job because of these fears. Plaintiff's psychiatric expert testified that after his examination of her he diagnosed that she had "residual traumatic psychosis." He did not prescribe any drugs to treat this but did recommend group therapy. He concluded that there were no indications that this psychosis was presently subsiding or that it would lessen in the near future. The defendants' expert psychiatrist testified that at least as of February, 1979, the symptoms of plaintiff's disorder had subsided.

On the basis of this evidence I find that plaintiff has demonstrated genuine psychological pain and should be compensated for that in the amount of $30,000.

This leaves plaintiff's claim for lost wages. As to this I need only say that there was a failure of proof by plaintiff. Certainly one could speculate as to how the phobias caused by the incident inhibited the plaintiff's ability to work, but the proof of causation and the extent of damage is just too attenuated to support the award of lost wages claimed.

In sum, judgment will enter in plaintiff's favor in the amount of $50,000.