Eddy ZERVIGON, Kelvin Zervigon, Felix Caban, Ruddy Zervigon, Julian Solano, Ronaldo Baro, Roberto Rodriguez and Daniel Gonzalez, Plaintiffs,

v.

PIEDMONT AVIATION, INC., d/b/a Piedmont Airlines and George Sturgis, Defendants.

No. 82 Civ. 0534.

United States District Court, S.D. New York.

March 15, 1983.

Emil M. Sanchez, New York City, for plaintiffs.

Bigham, Englar, Jones & Houston, New York City, for defendant Piedmont Aviation, Inc.; Robert E. Hirsch, New York City, of counsel.

EDWARD WEINFELD, District Judge.

Eight plaintiffs, who were removed from an airplane owned and operated by defendant, Piedmont Aviation, Inc. ("Piedmont"), which was about to depart from Tampa, Florida, to New York City, were each awarded $7,500 damages by a jury. Piedmont now moves pursuant to (1) Rule 50(a) of the Federal Rules of Civil Procedure for a directed verdict as to which the Court reserved decision at the end of the plaintiffs' case and again at the end of the entire case, and (2) Rule 50(b) for judgment notwithstanding the verdict ("nov").[1]

The plaintiffs allege that their involuntary removal was discriminatory and in violation of 49 U.S.C., section 1374(b).[2] Piedmont justified its action upon the ground that in the opinion of the captain of the airplane plaintiffs' continued presence thereon (1) "would or might be inimical to the safety of [the] flight," as provided by 49 U.S.C., section 1511,[3] and (2) presented the possibility that they "would cause disruption or serious impairment to the physical comfort or safety of other passengers or [the] carrier's employees," as provided under Piedmont's tariff filed with the Civil Aeronautics Board.[4]

The test on a motion for a directed verdict made at the close of a party's case and

1. Alternatively, the defendant moves for a new trial on the ground the jury's award is excessive.

2. 49 U.S.C. § 1374(b) provides in relevant part: No air carrier ... shall ... subject any particular person ... to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

3. 49 U.S.C. § 1511 provides in relevant part: [A]ny ... carrier may ... refuse transportation of a passenger or property when, in the opinion of the carrier, such transportation would or might be inimical to safety of flight.

4. Under the tariff, the airline has the right to refuse transportation to anyone:
Whose conduct or condition is or has been known to be obnoxious, offensive, intimidating, violent, or otherwise disorderly and there is a possibility in the prudent judgment of a responsible carrier employee, that such passengers would cause disruption or serious impairment to the physical comfort and safety of other passengers or carriers' employees, interfere with a crew member in the performance of his duties, aboard carrier's aircraft ... or otherwise jeopardize safe and adequate flight operations.

at the close of all the evidence upon which the Court reserved decision is essentially the same as that applied on a motion for judgment nov.[5] The Court may not substitute its judgment for that of the jury, but is bound to view the evidence in the light most favorable to the prevailing party and to give it the benefit of all inferences which the evidence fairly supports, even though contrary inferences may be drawn. A trial court may correct a jury verdict only if after so viewing the evidence it is convinced that the evidence is so strong and overwhelming in favor of the prevailing party that reasonable and fair-minded persons, in the exercise of impartial judgment, could not render a verdict against it.[6]

The issues must be considered against the totality of the facts as they existed at the time the captain took his action. His decision cannot be viewed in isolation separate from events that preceded it but in proper perspective as of the time of their occurrence and in relationship to one another. Whether a captain properly exercised the power to remove a passenger under 49 U.S.C., section 1511, "rests upon the facts and circumstances of the case as known to the [captain] at the time [he] formed [his] opinion and made [his] decision and whether or not the opinion and decision were rational and reasonable and not capricious or arbitrary in the light of all those facts and circumstances."[7] The fact that the safety and well being of many lives are dependent upon his judgment necessarily means that the captain is vested with wide discretion. "This is understandable when one considers that an airline usually must make such decisions on the spur of the moment, shortly before takeoff, without the benefit of complete and accurate information."[8] Thus, "the reasonableness of the carrier's opinion . . . is to be tested on the information available to the airline at the moment a decision is required. There is correspondingly no duty to conduct an in-depth investigation into a ticket-holder's potentially dangerous proclivities."[9]

We thus consider the evidence against the applicable law. The eight plaintiffs and their band boy[10] left LaGuardia Airport, New York City, on the morning of March 28, 1981 on a Piedmont airplane for Tampa, where they were to perform at a dance concert that evening. They were ticketed to return to New York the next morning at 7:05 on Piedmont Flight 372. After completing their performance, and following a brief stopoff in the early hours of the morning at a hotel, they arrived at the Tampa airport where they waited in an embarkation room preparatory to boarding the 7:05 a.m. plane. While there and waiting to enplane, the group, by their loud and boisterous manner, attracted the attention of Mr. Luis Ramos, another passenger. Mr. Ramos and his wife heard one of the group

---

**5.** *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962); *Michelman v. Clark-Schwebel Fiber Glass Corp.,* 534 F.2d 1036, 1042 (2d Cir.), cert. denied, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976).

**6.** *Unijax, Inc. v. Champion International, Inc.,* 683 F.2d 678, 680 n. 6 (2d Cir.1982); *Armstrong v. Commerce Tankers Corp.,* 423 F.2d 957, 959 (2d Cir.), cert. denied, 400 U.S. 833, 91 S.Ct. 67, 27 L.Ed.2d 65 (1970). *See also Pena v. Brattleboro Retreat,* 702 F.2d 322, 323 (2d Cir. 1983); *Gehrhardt v. General Motors Corp.,* 581 F.2d 7, 14 (2d Cir.1978); *Noonan v. Midland Capital Corp.,* 453 F.2d 459, 461 (2d Cir.), cert. denied, 406 U.S. 945, 92 S.Ct. 2044, 32 L.Ed.2d 333 (1972).

**7.** *Williams v. TWA,* 509 F.2d 942, 948 (2d Cir. 1975). *See also Cordero v. Cia Mexicana de Aviacion, S.A.,* 681 F.2d 669, 672 (9th Cir.1982).

**8.** *Adamsons v. American Airlines, Inc.,* 58 N.Y.2d 42, 457 N.Y.S.2d 771, 774, 444 N.E.2d 21 (Ct.Apps.1982). *See also Cordero v. Cia Mexicana de Aviacion, S.A.,* 681 F.2d 669, 672 (9th Cir.1982) ("air carriers often must make decisions within moments of take-off and with less than perfect knowledge"); *Williams v. TWA,* 509 F.2d 942, 948 (2d Cir.1975).

**9.** *Cordero v. Cia Mexicana de Aviacion, S.A.,* 681 F.2d 669, 672 (9th Cir.1982); *Williams v. TWA,* 509 F.2d 942, 948 n. 10 (2d Cir.1975).

**10.** While the term band "boy" has been used, the "boy" appears to have been a member of the group and about the same age as the plaintiffs, who range in age from about 25 to 35 years.

say to another in Spanish "when we arrive in the capital and they ask us for our experience on this flight," which Mr. Ramos regarded as unusual.

After the passengers were seated on the plane, it left the gate and readied for the takeoff. The members of the musical group were seated generally in the same area in the rear of the plane. However, before reaching the runway, the band boy assaulted a stewardess by grabbing her hand, twisting it and she screamed. She was visibly shaken and reported the incident and her concern about the group to the captain, George Sturgil, who immediately called airport security and returned to the gate, where he ordered the band boy removed from the plane. Following the band boy's removal, the plane again taxied for the takeoff. It returned a second time to the gate, however, to remove a bass instrument that erroneously was thought to belong to the band boy.

While the plane was at the gate for the second time, Mr. Ramos, who had observed the band boy being taken off the plane by a police or security officer, said to a passenger seated next to him, Mr. Herbert Hill, that the band boy "belong[ed] to a group of musicians, like eight or ten, who were talking in the waiting room. And one of them said to another, 'when we arrive in the capital, they will ask us about our experience on this flight.' " Hill understood Ramos to say "[w]on't the people be surprised when we get to the capital with this aircraft." The use of the word "capital" suggested to Hill that the plane would not land as scheduled, and "rang a bell" in his head that it was Havana, Cuba, where the plane would be forced to land. Thereafter, Hill signalled a stewardess and at his request

Ramos repeated the statement to her. She then apprised the captain of it, who immediately left the cockpit and went to where Hill and the Ramoses were sitting. Ramos then repeated his story to the captain. Captain Sturgil returned to the cockpit and ordered the removal of the plaintiffs. Mr. and Mrs. Ramos and Mr. Hill all testified that the overheard statement made them apprehensive that a highjacking to Cuba was in the making.[11]

There can be no doubt that as a matter of law the captain's decision was reasonable and appropriate. The facts known to him provided a sufficient basis for concluding that plaintiffs' continued presence on the aircraft would or might be inimical to the safety of the flight. From the totality of circumstances, the captain was completely justified in believing that there existed a potential highjack threat. As commander of the aircraft, he was charged with the responsibility for the one hundred persons aboard: both passengers and crew alike.[12] If he had decided otherwise, and continued the flight with the plaintiffs on board, his inaction might well have subjected the flight and passengers to grave danger.[13] Indeed, with the information conveyed to him and the prior incident of an assault upon a crew member, if the captain had not taken the action he did he may well have faced a charge of dereliction of duty. Overall, his decision to remove the plaintiffs, therefore, was both reasonable and prudent. There is not the slightest basis to the charge that the action was not taken in good faith. The contention that he should have questioned each member of the group before ordering their removal is unrealistic. He had sufficient indicia of conduct center-

---

**11.** Indeed, Mr. Ramos testified that "[i]f [the group] would not have [been] removed ... I would not have stayed because my wife already told me that she was not going to travel together with them." Tr. Luis Ramos at 10. *See also* Tr. Lydia Ramos at 5 ("I was scared .... My mind traveled very quickly, and I thought of a hijacking."); Tr. Herbert Hill at 10 ("I was quite relieved [when plaintiffs were removed] .... In fact, several other passengers clapped.").

**12.** 14 C.F.R. § 91.3(a) ("The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft").

**13.** Cf. *German-Bey v. National R.R. Passenger Corp.,* 546 F.Supp. 253, 258 (S.D.N.Y.1982) (railroad liable for failing to remove drunken passenger who assaulted plaintiff on board train).

ing about the members of the group that "would or might be inimical to the safety of [the] flight" to warrant forthwith action. He did not have to tempt fate so that the prospect of highjacking became reality.

*Adamsons v. American Airlines, Inc.,*[14] recently decided by the New York Court of Appeals, provides strong support for this conclusion. There, the airline's decision to exclude an ill passenger because, *inter alia,* of the potential contagiousness of her un-diagnosed disease was upheld. The Court noted that the "law endows the airline with discretion in accepting or rejecting a passenger based upon considerations of safety and problems inherent to air travel, and that such discretion, if exercised in good faith and for a rational reason, must be accepted."[15] In the face of the potential threat to the safety of the persons on board the plane by reason of their exposure to plaintiff, and in view of the speed with which the decision had to be made, the Court held it an abuse of discretion to submit the case to the jury, and dismissed the complaint.

In short, section 1511 is rendered meaningless if a carrier cannot exclude a group when they have been overheard by other passengers making statements that suggest to those passengers, and to the captain, that the plane will or might be highjacked with an incident of assaultive conduct by one of the group. Indeed, such a holding might well endanger passengers on future flights. Moreover, and entirely apart from section 1511, the captain's action was justified under the terms of the tariff filed with the Civil Aeronautics Board. The information conveyed to him by the flight attendant as to the conduct of the group was sufficient to alert him to the "possibility . . . that [the plaintiffs] would cause disruption or serious impairment to the physical comfort and safety of other passengers." Therefore, the Court grants defendant's motion and sets aside the jury's verdict. The complaint is dismissed and a verdict directed in favor of the defendant.

So ordered.

---

**14.** 58 N.Y.2d 42, 457 N.Y.S.2d 771, 444 N.E.2d 21 (Ct.Apps.1982).

**15.** *Id.* 457 N.Y.S.2d at 774, 444 N.E.2d at 24.