Ali SEDIGH and Ezat Sedigh, Plaintiffs,

v.

DELTA AIRLINES, INC., Defendant.

No. CV92–5106.

United States District Court,
E.D. New York.

April 25, 1994.

Ali Sedigh, Ezat Sedigh, plaintiffs pro se.

Gallagher, Gosseen & Faller (James A. Gallagher, Brian Morrissey, and Peter F. Vetro, of counsel), Garden City, NY, for defendant.

MEMORANDUM AND ORDER

NICKERSON, District Judge:

Plaintiffs, Ali Sedigh (Sedigh) and his wife Ezat Sedigh, brought this suit in New York State Supreme Court against defendant Delta Air Lines, a Delaware corporation, alleg-

ing unlawful imprisonment, assault, intentional infliction of emotional distress, slander, loss of comfort, and breach of contract. Plaintiffs seek over $4,000,000 in damages.

On October 28, 1992 defendant removed the case to this court. Defendant claims that jurisdiction lies in this court pursuant to 28 U.S.C. § 1331, as the claims are governed by various treaties and laws of the United States. *E.g.* The Federal Aviation Act of 1958, as amended, 49 U.S.C. app. §§ 1301 *et seq.* The complaint is drawn under state law alone. Whether or not the removal based on a federal question was appropriate, the court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

Defendant has moved for summary judgment. At oral argument the court determined that pro bono counsel should be appointed for plaintiffs, whose attorney had withdrawn from the action in February 1993. On March 1, 1994, over six months after oral argument and after several unsuccessful attempts to assign counsel, the court ordered that no further counsel should be assigned to plaintiffs.

## I

The complaint alleges, in pertinent part, the following.

On March 25, 1992 Sedigh was a passenger on a Delta Air Lines flight from Germany to the United States. The flight made a stopover at Frankfurt AM Main Airport. While at that airport, Sedigh made a comment to the effect, "So this is the country where so many [J]ews were killed." The flight captain then approached him, abused him verbally and physically, accused him of travelling with a false passport, and held him until the German Federal Police or Border Police arrived.

At defendant's request the Police arrested Sedigh and charged him with crimes relating to the alteration of his United States Passport. He was held for three days in handcuffs, beaten by the German Police, and forced to pay a 3,000 Deutschmark fine for the alleged crime, which he claims he did not commit.

## II

Defendant's affidavits, exhibits, and unopposed statement of material facts pursuant to Local Rule 3(g) show the following.

On March 24–25, 1992 Sedigh was travelling from the United States to Istanbul, Turkey. From John F. Kennedy International Airport he took Delta flight 106 to Frankfurt. There he was part of a group of connecting passengers who boarded Delta Flight 072. That flight was scheduled to leave for Istanbul at 12:05 p.m. but was delayed due to mechanical troubles with an air conditioning unit. He and the other connecting passengers boarded late, some time after 12:05.

While the plane was on the ground Sedigh immediately attracted the attention of the flight attendants because he was agitated and acted nervously. He was seated in a non-smoking section but asked to move to a smoking section. After he moved one of the flight attendants saw him make two trips to the lavatory. On both occasions he stayed in for a long time but did not flush the toilet. During his second trip the smoke detector in the lavatory became activated.

While Sedigh was in the lavatory the second time the "Flight Attendant in Charge," Eva Durczak, went to the cockpit to report his behavior to the captain. She recounted his trips to the lavatory and the fact that, although the airplane was cool, he was sweating profusely. The captain told her to have the flight attendants keep him under surveillance.

When Sedigh left the lavatory one of the flight attendants informed him that smoking in the lavatory was forbidden. He became more upset. Flight attendants and several passengers heard him muttering, "kill all the Jews," and vowing he was "going to get them."

Durczak reported Sedigh's increasing agitation and statements to the captain. The captain became concerned. He knew that on the plane were nine armed United States Federal Sky Marshals, assigned to flights deemed at greater risk of hijacking and sabotage. The captain asked the leader of that team of Marshals to come to the cockpit along with the Frankfurt Airport ground se-

curity coordinator, who was on the plane conducting a routine inspection. In the cockpit Durczak repeated her account to the Marshal and security coordinator.

The captain requested the Sky Marshals to evaluate the situation for security risk. The security coordinator directed the German police to bring some vehicles over to the plane. Two Sky Marshals then watched as Sedigh made a third trip to the lavatory. They searched the other lavatory and then waited for him to come out. At this time several passengers complained to the Marshals and flight attendant Iwona Zacharewecz that Sedigh had been heard saying "kill the Jews" and "Jews are to blame for world problems" before boarding, and that he had shouted "kill everyone" while on the plane. Durczak twice more returned to the cockpit to update the captain on the situation.

The captain again met with the leader of the Sky Marshals and the ground security coordinator. They reached a consensus that Sedigh posed a possible security risk. The captain recommended removing all of the passengers from the plane, ostensibly because of the continuing air conditioning malfunction, and then interviewing Sedigh in the airport terminal. The captain also said that law enforcement personnel should make any decision about him because the plane was still on the ground with its exterior doors open. The Sky Marshals' leader felt that he posed too great a risk to allow them to wait for buses to arrive to return the passengers to the terminal. The captain deferred to the Sky Marshal leader's judgment.

The Sky Marshals then met Sedigh as he exited the lavatory for the third time. They escorted him to the front of the plane. From there he was taken away by German police officers. The Federal Sky Marshals' report indicates that he went with no resistance.

Bomb experts on the Sky Marshals team thereafter searched the cabin in and around where Sedigh had been seated and in the lavatory. They discovered that someone had tampered with the smoke detector in the lavatory, but they found no bomb. His baggage was removed from under the airplane and searched for explosives. Nothing was found.

German authorities determined that the photograph on Sedigh's passport had been replaced. He was detained overnight and fined 3,000 Deutschmarks for attempting to travel through Germany with an altered passport. On March 26, 1992, the day after the events on Delta flight 072, he was returned to John F. Kennedy International Airport aboard Delta flight 107.

### III

Defendant moves for summary judgment on two grounds: (a) that plaintiffs' state law tort and contract claims are preempted under 49 U.S.C. app. § 1305, and (b) that defendant's actions were a proper exercise of its discretion under 49 U.S.C. app. § 1511.

### A. *Preemption Under Section 1305*

Congress passed the Airline Deregulation Act (the Act) in 1978, amending the Federal Aviation Act to provide in pertinent part, among other things,

> [N]o State ... shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier. 49 U.S.C. app. § 1305(a)(1).

One of the chief purposes of the Act was to relieve the airline industry of much of the economic regulation to which it had been subjected and to encourage the development of an air transportation system relying on market "competition to provide efficiency, innovation, and low prices, and to determine the variety, quality, and price of air transportation services." 49 U.S.C. app. § 1302(a)(9); *see also* H.R.Rep. No. 1211, 95th Cong., 2d Sess. 2–4, 55, *reprinted in* 1978 U.S.C.C.A.N. 3737, 3737–40, 3774. As the Supreme Court said in *Morales v. Trans World Airlines, Inc.*, —— U.S. ——, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992), the Act added section 1305 "[t]o ensure that the States would not undo federal deregulation with regulation of their own." *Id.* at ——, 112 S.Ct. at 2034.

In *Morales* the Court, construing the words "relating to rates, routes, or services," held that § 1305 preempted enforcement of fare advertising guidelines by state attorneys

general because the guidelines could have a forbidden impact on airline rates. In stating that the section enacted a broad preemption the court's opinion relied on the definition in Black's Law Dictionary of the words "relate to." In *dicta* the Court said that that section's preemptive effect could extend to common law claims:

> This case ... appears to us much like [*Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987)], in which we held that a common-law tort and contract action seeking damages for the failure of an employee benefit plan to pay benefits "relate[d] to" employee benefit plans and was pre-empted by ERISA.

*Id.* at ——, 112 S.Ct. at 2039.

The Court explicitly did not say which state common law actions the Act preempts. But it noted that some state actions would affect airline rates, routes, and services "in too tenuous, remote, or peripheral a manner" to be preempted. *Id.* at ——, 112 S.Ct. at 2040 (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 100 n. 21, 103 S.Ct. 2890, 2901 n. 21, 77 L.Ed.2d 490 (1983)).

Mr. Justice Holmes in *Towne v. Eisner*, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918), in holding that "income" does not necessarily mean the same thing in the Constitution and in the Income Tax Act, reminded us that "[a] word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used."

So this court deems it of limited usefulness to determine the scope of the exemption established by the Act by reference to a dictionary definition. Nor does it seem helpful to assume that words have the same meaning in § 1305 as they do in the ERISA statute, legislation having wholly unrelated purposes.

Some years ago the Court of Appeals for the Second Circuit rejected "the familiar one-word-one-meaning (or 'pigs is pigs') fallacy, which 'would compel the conclusion that a clotheshorse is an animal of equine species, and make it impossible to speak of drinking a toast.' " *R.H. Johnson & Co. v. Securities & Exchange Comm'n*, 198 F.2d 690, 696 (2d Cir.) (quoting *Irwin v. Simmons*, 140 F.2d 558, 560 (2d Cir.1944)), *cert. denied*, 344 U.S. 855, 73 S.Ct. 94, 97 L.Ed. 664 (1952).

■ Given that "words are slippery and thought is viscous," Henry Adams, *The Education of Henry Adams* 420 (1942 ed.), the sensible way to interpret statutory language is to reconstruct the context in which it was passed. *See Friedrich v. City of Chicago*, 888 F.2d 511, 514 (7th Cir.1989), *vacated*, 499 U.S. 933, 111 S.Ct. 1383, 113 L.Ed.2d 440 (1991). As noted, the dominant purpose expressed in the Act was to lift from the airline business the weight of federal regulation impeding the airlines from competing to achieve efficiency, innovation, and low prices.

■ The living thought embodied in § 1305 exemption was plainly to prevent states from hampering competition by reimposing similar regulation. The Act left alive another thought by not repealing the "saving" clause in the previous legislation providing that "[n]othing in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute." 49 U.S.C. app. § 1506.

By leaving in place a provision disclaiming a purpose to abridge common law remedies the Act was, of course, not countenancing the application of common law substantially to inhibit the competition. But that disclaimer does suggest caution before construing "relating to" so broadly as to prohibit common law remedies having little or no effect on competition though they may fairly be said to "relate to" rates, routes, or services within the meaning of a dictionary definition such as, "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." Black's Law Dictionary 1158 (5th ed. 1979).

■ The proper focus should be on whether or not the specific common law action addresses matters about which the airlines wish or are likely to compete. Viewed from that standpoint, Sedigh's claim should not be preempted under § 1305. To decline to grant an exemption from his claim would hardly cause an airline to alter its competitive strategy in the slightest degree.

The Second Circuit has not as yet ruled on § 1305, but the cases decided since *Morales* have for the most part reached the same result as has this court, if not by the same reasoning.

The Fifth Circuit is reconsidering its earlier position that the Act preempts even negligence actions. *Hodges v. Delta Airlines, Inc.,* 4 F.3d 350 (5th Cir.1993) (holding negligence action regarding falling box preempted in light of earlier unpublished circuit court decision but arguing that the result is incorrect), *petition for reh'g en banc granted,* 12 F.3d 426 (1994).

Most district courts have found broad preemption inappropriate in "services" cases. *See, e.g., Curley v. American Airlines, Inc.,* 846 F.Supp. 280 (S.D.N.Y.1994) (captain's report to ground personnel of plaintiff's alleged marijuana use not related to services); *Heller v. Delta Air Lines, Inc.,* No. 92 CIV 1937, 1993 WL 330093 (S.D.N.Y. Aug. 25, 1993) (negligence action regarding falling luggage affects service too remotely to be preempted); *Fenn v. American Airlines, Inc.,* 839 F.Supp. 1218 (S.D.Miss.1993) (false imprisonment and slander claims arising from theft allegation not preempted); *Margolis v. United Airlines, Inc.,* 811 F.Supp. 318 (E.D.Mich. 1993); *see also Harrell v. Champlain Enters.,* 157 Misc.2d 734, 603 N.Y.S.2d 116 (Sup. Ct.1993) (New York law invalidating release against negligence not preempted); *but see Williams v. Express Airlines I, Inc.,* 825 F.Supp. 831 (W.D.Tenn.1993) (false imprisonment claim of wheelchair-bound passenger barred).

B. *Discretionary Removal Under Section 1511*

The Federal Aviation Act provides another means of protecting airlines from suits such as this one. Section 1511 of title 49, appendix, sets the standard for an airline's refusal to transport a passenger who appears to pose a security threat.

> That section reads, in pertinent part:
> Subject to reasonable rules and regulations prescribed by the Secretary of Transportation, [a] carrier may also refuse transportation of a passenger or property when, in the opinion of the carrier, such transportation would or might be inimical to safety of flight.

The Court of Appeals for the Second Circuit has established criteria for determining whether an airline properly exercised its discretion to deny transport under this section.

> The test ... rests upon the facts and circumstances of the case as known to the airline at the time it formed its opinion and made its decision and whether or not the opinion and decision were rational and reasonable and not capricious or arbitrary in the light of those facts and circumstances. They are not to be tested by other facts later disclosed by hindsight.

*Williams v. Trans World Airlines,* 509 F.2d 942, 948 (2d Cir.1975).

The court said that section 1511 is designed to prevent harm from hijacking and terrorism, the threat of which requires airlines to make decisions "within minutes ... of take-off." *Id.* "The fact that the safety and well being of many lives are dependent upon [the captain's] judgment necessarily means that the captain is vested with wide discretion." *Zervigon v. Piedmont Aviation, Inc.,* 558 F.Supp. 1305, 1306 (S.D.N.Y.) (Weinfeld, J.), *aff'd,* 742 F.2d 1433 (2d Cir.1983).

On this motion for summary judgment the court draws all reasonable inferences in plaintiffs' favor. *Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991). Plaintiff has not presented any evidence in opposition to defendant's motion. After a party introduces evidence tending to show that there is no genuine issue of material fact, the non-moving party may not avoid summary judgment by resting on its pleadings. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

At oral argument Sedigh simply added that he is himself a Jew and that on the plane he had said, "This country kill[ed] the Jew[s]." In the months since the court ordered that no more counsel should be assigned, plaintiffs have not proceeded to prosecute the case or defend against the motion.

Drawing all reasonable inferences in plaintiffs' favor, this court finds the case one

where at best a nervous passenger was muttering about the Germans having killed Jews. He was apparently understood by those around him to be expressing a desire to kill all the Jews. The airline's crew and various safety personnel made what appeared to them to be a reasonable safety decision not to permit him to remain on board. They then thought it appropriate to make a thorough search for bombs on the plane.

The captain and his crew proceeded in a careful and reasonable manner. The crew informed the captain of their concerns. The captain consulted with all available safety personnel. The airline was not obliged to make a more thorough investigation into Sedigh's background before making its determination that he posed a threat to the airplane. *Williams*, 509 F.2d at 947–48. The court should not reject with the benefit of hindsight the consensus reached by those with responsibility to act.

### IV

Defendant's motion for summary judgment is granted. The case is dismissed.

So ordered.