**Thomas CHRISTEL, Plaintiff,**

**v.**

**AMR CORPORATION, American Airlines, Inc., American Eagle Airlines, Inc., the Port Authority of New York and New Jersey, Defendants.**

Civil Action No. 00–CV–6496.

United States District Court,
E.D. New York.

Sept. 20, 2002.

Patrick T. Hand, Washington, DC, representing Plaintiff.

Kathleen M. Collins, Keith E. Harris, The Port Authority of N.Y. & NJ, Jeffrey J. Ellis, Brian Patrick Sexton, Quirk and Bakalor, PC, New York, NY, representing Defendants.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

Plaintiff Thomas Christel brought this action against defendants AMR Corporation ("AMR"), American Airlines, Inc. ("American Airlines"), American Eagle Airlines, Inc. ("American Eagle"), and the Port Authority of New York and New Jersey ("Port Authority"), claiming that the decision by the Captain of American Eagle Flight 5149 to refuse plaintiff transportation and remove plaintiff from the plane was arbitrary and constituted a breach of the contract of carriage. In addition, plaintiff brought claims of malicious prosecution and/or abuse of process, false arrest and false imprisonment, intentional infliction of emotional distress, defamation, libel, or slander, and "wrongful ejection."[1] AMR, American Airlines, and American Eagle now move to dismiss plaintiff's complaint pursuant to Rule 12(b)(6) and Rule 56 of the Federal Rules of Civil Procedure ("FRCP") arguing that (1) the Captain's decision to refuse trans-portation to plaintiff was not arbitrary; (2) the contract of carriage, which exclusively and conclusively governs the rights and liabilities between the plaintiff and the airline for a refusal to transport, limits plaintiff's remedy for the refusal to transport to a refund of the unused portion of his ticket; (3) all the claims arising out of the arrest by the Port Authority police must be dismissed because plaintiff, who had a duty to leave Flight 5149 once instructed to do so by the airline customer service representative and the Port Authority police, brought upon himself the "false arrest," "false imprisonment," "malicious prosecution," "abuse of process," "intentional infliction of emotional distress," "defamation," "libel," and "slander"; (4) the claims arising out of plaintiff's arrest fail to state a cause of action under New York law.

### Background

Prior to October 23, 1999, Thomas Christel purchased an airline ticket for travel on American Eagle Airlines from Reagan National Airport in Washington, D.C., to JFK International Airport in New York City, and a return flight from JFK Airport to Reagan National Airport. *See* Defendant's Rule 56.1 Statement ("Def.'s Rule 56.1"), ¶ 1. The fare for the round trip airline ticket was $108.04. *See id.* ¶ 2.

The same day, Christel boarded American Eagle Flight 5149 at JFK Airport for the return flight to Reagan National Airport and sat in seat 2C. *See id.* ¶¶ 3, 6. Earlier that day, Christel had traveled from Amman, Jordan. *See id.* ¶ 4. The flight crew of Flight 5149 consisted of Captain David F. Nelson, First Officer Edwin Korzun, and Flight Attendant Patricia Mathieson. *See id.* ¶ 7. The flight was full. *See id.* ¶ 8.

---

1. This action was removed from the Supreme Court, Queens County, on federal question grounds because plaintiff's right to relief is governed by a provision of the Federal Avia-tion act that states that an air carrier "may refuse to transport a passenger or property the carrier decides is or might be inimical to safety." 49 U.S.C. § 44902.

During the boarding process, Mathieson noticed that a carry-on bag belonging to the passenger seated in seat 1A was located on the floor in the emergency exit row in front of seats 1A and 1B. *See id.* ¶ 9. The bag contained a computer. *See id.* Since seat 1A was a "bulkhead" seat, there was no seat located in front of seat 1A and, accordingly, no stowage space existed underneath that seat for the carry-on. *See id.* ¶ 11. Stowage of carry-on baggage in the aisle or in the emergency exit row is not permitted. *See id.* ¶ 10. Mathieson asked the passenger seated in seat 1A to stow the carry-on into an overhead bin. *See id.* ¶ 12. After Mathieson and the passenger attempted to stow the bag into the overhead bin, Mathieson realized that there was not enough space in the overhead bin. *See id.* Mathieson took the carry-on and looked underneath the seats nearby for suitable stowage space. *See id.* ¶ 13. Almost all the stowage space underneath the seats nearby already contained carry-on baggage. *See id.* ¶ 14. Mathieson asked Christel to place the carry-on bag underneath the seat in front of him as that space was empty. *See id.* ¶ 17. According to defendants, Christel became "somewhat angry" because he did not want the carry-on bag to be stowed underneath the seat in front of him, but Mathieson stowed the carry-on bag there anyway. *See id.* ¶¶ 19, 21, 22.

Christel claims that, when Mathieson told him to put the bag under the seat, she handed the bag to him; he said nothing and complied. *See* Plaintiff's Statement Pursuant to Local Rule 56.1(b) ("Pl.'s Rule 56.1"), at 1, 2. Christel maintains that he never raised his voice to the flight attendant. *See id.* at 2.

After the carry-on bag was stowed, the aircraft door was closed and the aircraft left the gate and began to taxi toward the runway for takeoff. *See* Def's Rule 56.1, ¶ 23. Mathieson then noticed that the passenger seated in seat 2A had a carry-on bag stowed behind his legs. *See id.* ¶ 24. Mathieson asked that passenger to hand the carry-on bag to her and began looking for suitable stowage space for it. *See id.* ¶ 25. Mathieson opened the overhead bin above seats 2C and 2D and observed that there was sufficient stowage space for this carry-on if she rearranged the contents of the overhead bin and removed a small nylon backpack. *See id.* ¶ 26. Thus, Mathieson removed the nylon backpack and asked the passengers whom it belonged to. *See id.* ¶ 28. According to defendants, Christel stated that the backpack belonged to him and grabbed it out of Mathieson's hand. *See id.* ¶¶ 29, 30. Mathieson instructed Christel to stow the backpack in the remaining space that she observed was available underneath the seat in front of Christel. *See id.* ¶¶ 27, 31. According to defendants, Christel made no attempt to stow the nylon backpack with the carry-on containing the computer underneath the seat in front of him. *See id.* ¶ 34. Defendants contend that, at this time, Mathieson perceived that Christel was very angry and she started to think that his anger and hostile conduct toward her could become a safety issue during flight. *See id.* ¶ 32.

Christel claims that Mathieson handed him the backpack, he looked at the other bag under his seat and determined that there was not enough room for the backpack.[2] *See* Pl.'s Rule 56.1, at 3. Accordingly, Christel told Mathieson "in a matter of fact tone" that he did not think it was reasonable to ask him to put two bags under his seat, and, since the backpack was his bag, he would like to put it under his seat and give Mathieson the other bag.

---

2. Christel testified at a deposition that his backpack was about a foot and a half tall and slightly wider. *See* Christel Dep. at 26.

*See id.* at 4. Then, Christel placed the bag that did not belong to him in the aisle next to his seat where Mathieson was standing for her to take it and place somewhere else. *See id.* at 5; Christel Dep. at 26–27.

At that time, Christel was wearing headphones and listening to music. *See* Def's Rule 56.1, ¶ 35. Mathieson instructed Christel to turn off the music because passengers are not permitted to use portable electronic devices during the time after an aircraft leaves the departure gate and is preparing for takeoff. *See id.* ¶¶ 36, 37. According to defendants, Christel did not comply with Mathieson's instruction this time either. *See id.* ¶ 38. Mathieson repeated her instruction twice, and, according to defendants, Christel refused to comply both times. *See id.* ¶¶ 39, 40. Defendants further maintain that, after Mathieson instructed Christel to turn off the music a third time, he responded by yelling that he did not have to listen to her. *See id.* ¶ 41. Christel kicked the carry-on containing the computer out from underneath the seat in front of him and threw it into the emergency exit aisle in front of seats 1A and 1B. *See id.* ¶¶ 42, 44.

According to Christel, Mathieson "barked out, 'Take those headphones off right now,' " and he took them off and put them in his backpack as instructed. *See* Pl.'s Rule 56.1, at 6. A total of thirteen passengers gave Christel their names and addresses to back him up in the event he wanted to complain about Mathieson's behavior. *See id.* at 4. James Deegan, one of the passengers on that flight, stated in his affidavit that he did not observe Christel throw a bag, or act in a belligerent or inappropriate manner, nor did he hear Christel speak in a loud or abusive manner. *See* Deegan Affid. In fact, according to Deegan, Mathieson was uncontrollably angry. *See id.* He also "heard Mathieson yell at Christel to remove his earphones...." *See id.*

Defendants claim that Mathieson perceived that Christel was extremely angry and agitated at this time. *See Def's Rule* 56.1, ¶ 48. She determined that Christel's hostile and disorderly conduct posed a potential threat to the safety of the flight and the performance of her safety-related obligations. *See id.* ¶ 49. Accordingly, Mathieson walked to the back of the aircraft, called the cockpit on the aircraft's interphone, and stated to Captain Nelson that there was a disruptive passenger who had interfered with and distracted her from her safety-related duties by throwing a carry-on bag into the aisle and refusing to comply with her instructions regarding the stowage of the carry-on baggage. *See id.* ¶ 51. Mathieson also conveyed to Nelson her concern about Christel's ability to cooperate with her instructions during the flight and in any in-flight emergency that might arise. *See id.* Mathieson requested Captain Nelson to remove the passenger from the flight, and suggested that a customer service agent and the police should be present when Christel was asked to leave. *See id.* ¶ 52. Nelson decided to refuse transportation to Christel and returned the aircraft to the gate. *See id.* ¶ 53. The Captain called the ground operations department of American Eagle and advised them that he was returning to the gate to remove a passenger and wanted airport security present to ensure that the safety of the other passengers and flight crew was not jeopardized when the passenger was told to leave the aircraft. *See id.* ¶ 54. The conversations between Mathieson, Nelson, and American Eagle's ground operations department were not broadcast over the aircraft's public address system. *See id.* ¶ 55.

After the aircraft returned to the gate, a customer service representative boarded the aircraft, and a short time later police officer Joanne Nikiel boarded the aircraft, and later two other police officers also

boarded the aircraft. *See id.* ¶ 56. Mathieson identified Christel to the customer service representative and the police, and told them that Christel was no longer permitted on the aircraft because he had been disruptive and had interfered with and distracted her from her safety-related duties by throwing a carry-on bag into the aisle and by refusing to comply with her instructions regarding the stowage of carry-on baggage. *See id.* ¶ 57. Captain Nelson spoke with one of the police officers that came to the aircraft and stated that Christel was disruptive on board the aircraft and was no longer permitted to remain on the aircraft. *See id.* ¶ 58.

Ms. Jordan, the customer service representative, came to Christel's seat by herself and told him that he had to get off the plane. *See id.* ¶ 59. Christel responded by telling the customer service representative that he would not get off the plane. *See id.* ¶ 60. Jordan reiterated her instruction, and Christel again refused. *See id.* ¶¶ 61, 62. Jordan then told Christel that, if he did not leave the aircraft voluntarily, the police would take him off. *See id.* ¶ 63. Christel again refused to leave the plane. *See id.* ¶ 64. Christel claims that "he politely told Ms. Jordan . . . that he did not do anything wrong." *See* Pl.'s Rule 56.1, at 9. Christel also claims that "there wasn't a big effort on [Jordan's] part to find out what the facts were," and that she did not respond to his inquiry regarding "what arrangements would be made about getting him another flight and putting him up in a hotel overnight." *See id.* Mathieson, on the other hand, testified at her deposition that she heard Jordan offering Christel a hotel room and a flight out on the following day. *See* Mathieson Dep. at 96.

Officer Nikiel then came to Christel's seat and told him that he had to leave the aircraft. *See* Def's Rule 56.1, ¶ 66. Christel refused to leave the aircraft. *See id.*

¶ 67. Nickiel told Christel that, if he did not leave the plane voluntarily, he would be arrested. *See id.* ¶ 68. Officer Nikiel spoke with Christel more than twenty minutes. *See id.* ¶ 70. Christel refused to comply with officer Nikiel's repeated directions to leave the plane voluntarily. *See id.* ¶ 71. Officer Nikiel perceived that Christel was agitated and raised his voice while she was speaking with him. *See id.* ¶ 72.

A second police officer, officer Guerra, then came to plaintiff's seat and told plaintiff "do yourself a favor, get off the plane." *See id.* ¶ 75. Christel responded that he was not going to leave the plane. *See id.* ¶ 77. Guerra then advised Christel that he would be arrested if Christel did not leave voluntarily. *See id.* ¶ 78. Christel again responded that he was not leaving the plane. *See id.* ¶ 81. According to Christel, "he politely declined to leave the aircraft because he had done nothing wrong." *See* Pl.'s Rule 56.1, at 9.

Officer Nikiel and the third police officer then arrested Christel. *See* Def's Rule 56.1, ¶ 85. According to defendants, neither Captain Nelson nor Mathieson requested or directed the police to arrest Christel. *See id.* ¶¶ 57, 58. Christel claims that he heard the police officers ask the customer service representative something to the effect, "Well, what do you want to do?", after which he was placed under arrest. *See* Pl.'s Rule 56.1, at 9. The police escorted Christel off the aircraft, and, approximately two hours later, Flight 5149 departed for Washington, D.C. *See* Def's Rule 56.1, ¶¶ 87, 88.

Christel was charged with trespass and disorderly conduct. *See* Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss and/or for Summary Judgment ("Pl.'s Memo."), at 7. Prior to being released after his arraignment, Christel spent twenty hours in five different cells. *See id.*

The charges against plaintiff were dismissed on speedy trial grounds. *See* Def's Rule 56.1, ¶ 89.

### Discussion

Defendants argue that they are entitled to summary judgment on plaintiff's tort claims arising form the decision to remove him from the aircraft because the decision was not arbitrary and capricious.

■ The Federal Aviation Act provides that an airline "may refuse to transport a passenger or property the carrier decides is or might be inimical to safety." 49 U.S.C. § 44902. "Such a refusal cannot give rise to a claim for damages under either federal or New York law unless the carrier's decision was arbitrary and capricious." *Schaeffer v. Cavallero,* 54 F.Supp.2d 350, 351 (S.D.N.Y.1999); *see also Williams v. Trans World Airlines,* 509 F.2d 942, 948 (2d Cir.1975). The analysis of whether an airline has properly exercised its discretion to remove a passenger is based upon the facts and circumstances known to the decision-maker at the time he or she made the decision. *See Norman v. Trans World Airlines, Inc.,* 2000 WL 1480367, at *3 (S.D.N.Y. Oct.6, 2000). "The decision is not to be tested by other facts later disclosed by hindsight." *Id.* (citing *Sedigh v. Delta Airlines, Inc.,* 850 F.Supp. 197, 201 (E.D.N.Y.1994)).

Christel maintains that he did not behave in a manner that any reasonable person would view as "dangerous or even offensive," and that defendants' decision to have him ejected from the plane was based on false information provided by Mathieson. Christel's argument that defendants' decision to remove him from the plane was arbitrary and capricious is based on a false premise that, since Captain Nelson is not a party to this lawsuit, the fact that he was the decision-maker is somehow irrelevant.

■ A captain of an airplane is entitled without further inquiry to rely upon a flight attendant's representations that a conflict with a passenger might distract the flight attendant from performing his or her safety-related duties. *See id.* (citing *Sedigh,* 850 F.Supp. at 202 (holding that although passenger's remarks were misunderstood by cabin crew, airline acted reasonably in removing him without detailed inquiry)); *Zervigon v. Piedmont Aviation, Inc.,* 558 F.Supp. 1305, 1307 (S.D.N.Y. 1983) (holding that pilot's reliance on inferential multiple hearsay in removing passenger because of potential hijacking risk was reasonable under the circumstances).

■ In this case, Mathieson called the cockpit on the aircraft's interphone, and stated to Captain Nelson that there was a disruptive passenger who had interfered with and distracted her from her safety-related duties by throwing a carry-on bag into the aisle and refusing to comply with her instructions regarding the stowage of carry-on baggage. After Captain Nelson received this safety-related message from the only flight attendant on board the plane, while the aircraft began to taxi toward the runway for takeoff, he acted within his discretion when he made the decision to remove Christel from the plane. Even if the battle of the egos escalated to Mathieson making exaggerated or even false representations to the Captain, Captain Nelson did not have an obligation to leave the cockpit and investigate the truthfulness of Mathieson's statements. *See Norman,* 2000 WL 1480367, at *3; *cf. Shaeffer v. Cavallero,* 54 F.Supp.2d 350, 352 (S.D.N.Y.1999) (holding that a jury could find that defendants acted in an arbitrary and capricious manner in removing plaintiff on the grounds of safety risk where they observed his loud protests of a non-safety matter, i.e. their refusal to give him a baggage receipt). Since the record is devoid of any indication that Captain Nelson's decision to refuse Christel transportation was "retaliatory or malevolent," *see Norman,* 2000 WL 1480367, at *3, such

decision was not arbitrary and capricious. Accordingly, defendants are entitled to summary judgment on Christel's tort claims arising from the decision to remove him from the plane.[3]

## Conclusion

For the foregoing reasons, defendants' motion for summary judgment on all of plaintiff's claims is granted. The Clerk of the Court is directed to close the case.

3. Since Christel's tort claims arising from the decision to remove him from the plane are dismissed for failure to establish that the Captain's decision was arbitrary and capricious, defendants alternative arguments raised in support of their motion for summary judgment on Christel's state law claims do not have to be addressed here. However, defendants' argument, in reliance on *Schaeffer v. Cavallero*, 54 F.Supp.2d 350 (S.D.N.Y.1999), that all claims that arise out of plaintiff's arrest must be dismissed because the sole proximate cause of the arrest was plaintiff's refusal to leave the plane merits further discussion. I disagree with the proposition that under New York law an individual cannot bring a false arrest claim against a private party who procures the arrest of that individual by making a false representation to the police about the individual's conduct, which results in the police arresting the individual for trespass. *See Dunn v. City of Syracuse*, 83 A.D.2d 783, 443 N.Y.S.2d 463, 464 (4th Dep't 1981) ("One who wrongfully accuses another of criminal conduct and induces or procures that person's arrest may be liable for false arrest."). *See also Gotbetter v. Port Auth. of New York and New Jersey*, 2000 WL 328044, at *4 (S.D.N.Y. Mar.28, 2000).